In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-4089

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROGER D. SLONE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 2:09 CR 00038-RL-APR-4—**Rudy Lozano**, *Judge.*

ARGUED NOVEMBER 2, 2010—DECIDED FEBRUARY 22, 2011

Before CUDAHY, FLAUM, and KANNE, *Circuit Judges.*

FLAUM, *Circuit Judge.* Roger D. Slone was arrested during an operation in which law enforcement worked their way down the drug-supply food chain. An undercover agent with the Drug Enforcement Administration ("DEA") drove a tractor-trailer filled with marijuana to an Indiana warehouse; law enforcement then took into custody those who received drugs from the shipment. Slone was arrested for conducting countersurveillance or security for a vehicle into which 500 kilograms of

the drugs had been offloaded. He was subsequently convicted of conspiracy to distribute marijuana and sentenced to 120 months in prison. On appeal, Slone maintains that police lacked probable cause to arrest him. Even if true, that would not be sufficient to over-turn his conviction. *Evans v. Poskon*, 603 F.3d 362, 364 (7th Cir. 2010). However, if police lacked probable cause to arrest him, then the exclusionary rule should have applied and led the district court to suppress self-incrim-inating post-arrest statements that Slone made to a federal agent, as well as evidence that was found in Slone's vehicle. He argues as much and likewise con-tends that evidence from his vehicle should have been suppressed under the Supreme Court's decision in *Arizona v. Gant*, 129 S. Ct. 1710 (2009). Neither argument is persuasive, however, and we affirm the judgment of conviction.

## I. Background

Neither Slone nor the government takes issue with the district court's deferentially-reviewed factual findings. Therefore, we take the underlying facts primarily from that court's ruling on Slone's motion to suppress, filling in a few gaps as needed. In early 2009, DEA agents in Merrillville, Indiana, received word that a drug-world figure named Arechiga unwittingly asked undercover DEA agents to help him transport about 1,000 pounds of marijuana from Texas to two locations in Indiana. The DEA obliged. At the time when the drugs left Texas, however, Arechiga did not disclose the specific locations

where the drugs were to be delivered (and he never disclosed the identity of the recipients). Of course, the agents retained a notable leg up in the operation—an undercover agent at the wheel of the tractor-trailer used to transport the drugs. Other federal agents followed the shipment as it made the trip to Indiana.

On February 1, 2009, the day before Slone's arrest, Arechiga called the undercover agent-cum-driver. Arechiga directed the driver to take the tractor-trailer to Lafayette the next morning and then call for further instructions. The driver, still being followed by other federal agents, drove to Lafayette. The drop-off point for the drugs remained unknown. After directing the tractor-trailer to an initial meeting point, Arechiga told the driver to follow a pickup truck with hunting stickers in the window and then called to tell the driver to break off and continue following an "orange-ish" Monte Carlo instead. (Given that the driver was an undercover agent, every twist, turn, and change of plans was relayed by the driver to one of the federal agents. That agent spread word among the rest of the surveillance team.)

The Monte Carlo guided the tractor-trailer to a warehouse, and the undercover agent backed the cargo-laden transport into one of the bays. Agents set up surveillance around the location. The driver surreptitiously communicated to the surveillance team that about 500 kilograms of marijuana was being offloaded into a blue Ford Explorer inside the warehouse. About five to ten minutes later, the tractor trailer left the warehouse (presumably en route to the next dropoff). Immediately

thereafter, at least one of the agents observed the blue Explorer leave the warehouse and alerted two other agents—named Walker and Patrick—that the vehicle was headed their way. Walker and Patrick, positioned around the corner from the warehouse, made ready to follow.

After the Explorer passed Walker and Patrick's location, however, a red Dodge truck pulled out of a nearby lot. Slone was a the wheel of the Dodge truck, which pulled up close behind the Explorer. Agents Walker and Patrick turned the two-car caravan into a threesome, pulling behind the Dodge truck in their unmarked car. For approximately the next 20 minutes, the Dodge truck stayed within one vehicle-length of the Explorer while federal agents followed. Twenty minutes on a highway might not be all that unlikely, but the route was not a straight shot. Multiple turns on at least three roads were involved, including a multi-lane highway (where relative positions among vehicles are more likely to change) and two county roads—the latter of which we are told lies "out in the middle of nowhere." The two vehicles were essentially stuck together the entire way.

While the agents followed, the passenger in the Dodge truck folded down the visor even though the sky was overcast. The passenger then continually checked the vanity mirror and passenger-side mirror while talking on his cell phone. Agent Walker testified that, based on his training and experience, the factual picture made it appear that the Dodge truck was conducting countersurveillance or security for the marijuana contained in the Explorer.

The agents decided to stop both the Dodge truck and the Explorer and arrest the vehicles' occupants, which they did in coordination with the Indiana State Police. Agent Walker took Slone into custody after Slone attempted to flee. Law enforcement officers then searched Slone's vehicle, which yielded $17,000 in cash and a mobile telephone (the "vehicle evidence"). Slone was transported to Porter County Jail. He had not been read *Miranda* warnings at that point, but Slone started a conversation during the trip. He asked one of the agents what federal court proceedings entailed. The brief response caused Slone to say, "I shouldn't have done this." He explained that he had been denied public assistance and needed to make ends meet. Warring, it seems, with the consequences of his actions versus their perceived morality, he also expressed his opinion that marijuana does not harm anyone.

Slone was charged in a one-count indictment with conspiring to distribute 100 kilograms or more of marijuana, in violation of Sections 841(a)(1) and 846 of Title 21, United States Code. The case proceeded to trial after Slone unsuccessfully moved to suppress the evidence against him. A guilty verdict followed a short jury trial, and Slone was sentenced to a term of 120 months in prison. He seeks a new trial based on the denial of the motion to suppress evidence.

## II. Discussion

Slone maintains that he is entitled to a new trial because the district court should have suppressed the

self-incriminating statements and the vehicle evidence as fruits of a poisonous tree—namely, his arrest without probable cause. He also argues that the search of his vehicle incident to his arrest was unlawful under *Arizona v. Gant*. When reviewing a district court's denial of a motion to suppress evidence, we review factual findings for clear error, but decide issues of law without deference to the proceedings below. *United States v. Lee*, 618 F.3d 667, 673 (7th Cir. 2010). We conclude that the district court appropriately denied Slone's motion to suppress.

The plain language of the Fourth Amendment to the United States Constitution prevents unreasonable searches and seizures and provides that "no warrants shall issue, but upon probable cause." U.S. CONST. amend IV. The text of the amendment does not actually require police to obtain a warrant prior to conducting a search or seizure, but that is how the amendment has been interpreted. *United States v. Garcia*, 474 F.3d 994, 996 (7th Cir. 2007). There are a small number of established exceptions to the warrant requirement, however. For example, police may arrest someone outside of the home when they have probable cause to believe that a suspect has committed, is committing, or is about to commit an offense. *E.g., Gerstein v. Pugh*, 420 U.S. 103, 111 (1975). Likewise, police may conduct a warrantless search of a vehicle, including "a search of any container that might conceal the object of the search," when they have probable cause to believe that the vehicle contains contraband. *Florida v. White*, 526 U.S. 559, 569 n.3 (1999). In both situations, a warrantless search or seizure is reasonable and therefore constitutional.

Generally, a warrantless search or seizure in the absence of probable cause is unreasonable. *See, e.g.*, *Doe v. Heck*, 327 F.3d 492, 513 (7th Cir. 2003) (warrantless searches may be upheld only if they fall "within one of the few specifically established and well delineated exceptions to the Fourth Amendment's warrant and probable cause requirements") (quotation marks omitted). And when police conduct an unreasonable search or seizure, the exclusionary rule usually vindicates the Fourth Amendment's protections by kicking out the unlawfully obtained evidence. *United States v. McGraw*, 571 F.3d 624, 628 (7th Cir. 2009). "Evidence which is obtained as a result of an illegal arrest is fruit of the poisonous tree and it must be excluded unless the government can show that it was obtained as a result not of the illegality, but rather 'by means sufficiently distinguishable to be purged of the primary taint.'" *United States v. Swift*, 220 F.3d 502, 507 (7th Cir. 2000) (quoting *Wong Sun v. United States*, 371 U.S. 471 (1963)). Against that general backdrop, we turn to the parties' principal arguments.

## A. Probable Cause and Slone's Fruit-of-the-Poisonous-Tree Argument

Slone argues that the exclusionary rule should apply to his statements and to the vehicle evidence because police lacked probable cause to arrest him. Probable cause means that there are "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in

believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). The standard, an effort to accommodate competing societal values, *Beck v. Ohio*, 379 U.S. 89, 91 (1964), does not require police to gather enough evidence to support a conviction or even enough to demonstrate that it was more likely than not that the suspect was engaged in criminal activity. *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). In evaluating whether probable cause existed, a court "steps into the shoes of a reasonable person in the position of the officer."

According to Slone, the absence of key information meant that police did not develop probable cause. Specifically, he notes that agents lacked prior knowledge that Slone would be involved with the controlled delivery of marijuana, the agents lacked knowledge of inherently illegal activity committed by Slone, and the agents did not know Slone's identity until after he was arrested. Of course, Slone's identity itself is irrelevant—imagine that police observed a vicious beating. The identity of the assailant would not furnish police with more or less probable cause to make an arrest. More fundamentally, Slone's argument is flawed because it focuses on what law enforcement did not know, rather than what they did. One can always point out informational gaps, yet the probable cause inquiry asks what a law enforcement officer knew rather than what he did not. *Cf. Mahoney v. Kesery*, 976 F.2d 1054, 1057-58 (7th Cir. 1992) (the analysis is driven by what the arresting officers knew, not what others knew).

In this case, police developed probable cause to believe that Slone was part of a drug conspiracy because of the extended, coordinated activity that law enforcement observed. Here is what the agents knew: the Explorer had just been loaded with 500 kilograms of marijuana. Immediately after exiting the location where the exchange occurred, the Dodge truck linked up with the Explorer, remaining approximately one vehicle-length behind. That by itself would not be sufficient—the situation would be akin to an individual running into a bank robber on the sidewalk immediately after a robbery; a prudent police officer would not believe that the mere proximity of the two individuals suggests a relationship between them. *See United States v. Ingrao*, 897 F.2d 860, 861-63 (7th Cir. 1990). However, the Dodge truck stayed behind the Explorer for twenty minutes, and as more time passed it became increasingly likely that the two cars were engaged in coordinated activity as the cars entered a multi-lane highway, where cars often change relative positions. And suspicion would only grow as the cars left the highway and, over at least two more turns, ended up in "the middle of nowhere." As Agent Walker testified at the suppression hearing, the location was one where it would have been unlikely to see two cars at the same time.

Knowing that there were drugs in the Explorer and that the Dodge truck followed for an improbably long duration, making a series of turns, to a remote place would alone have furnished law enforcement with probable cause to suspect that the driver of the Dodge truck was engaged in criminal activity. It also makes the case

readily and rightfully distinguishable from cases like *Ingrao*, 897 F.2d at 861-63 (probable cause requires a high degree of suspicion and the standard was not met merely because the defendant was located close to the same place at close to the same time as a suspected drug figure, and there was no evidence of an association between them). Slone argues, "If [these facts are] enough to constitute probable cause, any citizen who has the misfortune to be traveling behind a truck or car that is being surveilled would be subject to stop, arrest, and search." But that pronouncement at once overstates the implications of our decision and understates the facts of this case. Taking the facts together, the practical probabilities involved—"common-sense conclusions about human behavior," *Illinois v. Gates*, 462 U.S. 213, 231-32—teach that the movements of the Explorer and the Dodge truck were not likely the product of misfortune or happenstance. Unlike in *Ingrao*, the co-ordinated movements linked the defendants together.

What is more, the activity of Slone and his passenger—constantly checking the mirrors and talking on his mobile phone as he looked back at the unmarked car behind them—only added to the reasonableness of the agents' suspicions. The fact that no individual act was unlawful does not matter. If an officer had in every case to observe an illegal act before effecting an arrest, the test would be called certain cause, or more-likely-than-not cause, two formulations that have been rejected. *See also United States v. Price*, 888 F.2d 1206, 1208 (7th Cir. 1989) (probable cause requires "substantial chance" of criminal activity) (quoting *Gates*, 462 U.S. at 244 n.13).

What matters is that based on the totality of the circum-stances, *United States v. Dismuke*, 593 F.3d 582, 586 (7th Cir. 2010), which included reasonable inferences based on law enforcement experience, *Gates*, 462 U.S. at 232 (the facts should be understood in terms of how those versed in law enforcement would have viewed them, rather than "library analysis by scholars"); *United States v. Parra*, 402 F.3d 753, 765 (7th Cir. 2005), a reasonable person would have believed that Slone was helping to transport 500 kilograms of marijuana for later distribution.

Although the conclusion we reach is necessarily case-specific, the outcome comports with the Tenth Circuit's decision in *United States v. Soto*, 375 F.3d 1219 (10th Cir. 2004), which like our case involved coordinated activity between two vehicles, a blue truck and a white truck. In *Soto*, the DEA negotiated a deal involving the purchase of 2 kilograms of cocaine. One of the de-fendants told an undercover agent that he would be driving a white truck and would meet the undercover agent at a gas station, where the transaction was to be consummated. On the day of the deal, however, before the white truck showed up, a previously unknown blue truck arrived at the gas station. It circled the lot slowly, then left. The white truck then showed up, circled slowly, and stayed. At some point, the blue truck returned to the vicinity and stayed, positioned so that any occupants could observe the transaction. Before the transaction was complete, the undercover agent got into the white truck, which maneuvered near the blue truck and then proceeded toward the location where the drugs were being stored. The blue truck followed.

Both cars were stopped shortly thereafter. On these facts, the Tenth Circuit concluded that police had probable cause to arrest the occupant of the blue truck. *Id.* at 1222-23 (rejecting the argument that the defendant was arrested based solely on his presence at a gas station and concluding that the connection between the two vehicles became obvious as more time passed and coordinated activities occurred).

The *Soto* case provides a useful comparison. The key difference between the facts of this case and Soto's case is that the latter involved coordinated vehicular activity that occurred for a shorter duration, but both prior to and during a drug transaction. The analysis in both cases, however, works much the same way: individually innocuous acts added up to probable cause that the vehicles' occupants were acting in concert to traffic drugs. *See also United States v. Ocampo*, 937 F.2d 485, 490 (9th Cir. 1991) ("The fact that some . . . acts, if reviewed separately, might be consistent with innocence is immaterial."). In each case, the officers knew to a virtual certainty that one vehicle's occupants were involved in drug trafficking. In *Soto*, the nearly identical movements—slow circling of the lot—was odd given their temporal proximity and the fact that the blue truck returned to the vicinity and subsequently engaged in brief coordinated movements. Temporal forces work against Slone, too, and the activities were observed for a longer duration. As more and more time passed and the trucks remained in a caravan with one another, making the same turns, taking them to the same spot in an isolated location, police had more and more cause for

suspicion. Particularly when combined with the evidence that Slone's passenger was talking on his mobile phone while eyeing the agents behind him, this does not strike us as a close case.

Although the decision in *Soto* is the most closely analogous case we have located, the outcome sits comfortably among the decisions of other circuits that have considered the lawfulness of stops based on coordinated vehicular activity—both those ruling that police acted properly and those determining that they did not. *Compare United States v. Medina-Gasca*, 739 F.2d 1451, 1453-54 (9th Cir. 1984) (reasonable suspicion which ripened into probable cause in a case involving transportation of illegal aliens, where police observed tandem driving of heavily laden vans, the vans parked together, and the vans made a U-turn together along a corridor known for circumventing border checkpoints), *and United States v. Saenz*, 578 F.2d 643, 647 (5th Cir. 1978) (stop was lawful where, among other things, cars drove in tandem for 70 miles and both had CB antennas), *with United States v. Robert L.*, 874 F.2d 701, 704 (9th Cir. 1989) (stop based on tandem driving was improper where two vehicles drove in tandem for approximately 1 kilometer). *See also United States v. Marin*, 761 F.2d 426, 431-32 (7th Cir. 1985) (circuitous driving, in the context of other information known to law enforcement, sufficient to support probable cause).

In sum, we agree with the district court that officers had probable cause to stop Slone and arrest him. Therefore, neither his post-arrest statements nor the vehicle

evidence can be suppressed as fruits of an unlawful arrest. *United States v. Shoals*, 478 F.3d 850, 853 (7th Cir. 2007) (per curiam).

## B. Search Incident to Arrest and *Arizona v. Gant*

Slone advances a second argument that would apply only to the vehicle evidence that police recovered during a search of the truck's passenger compartment. He maintains that, under the Supreme Court's decision in *Arizona v. Gant*, the search of his vehicle was unconstitutional. We respectfully disagree. Although *Gant* limits the circumstances when officers may conduct a search of a passenger compartment incident to a lawful arrest, the search was lawful because it would have been reasonable for officers to believe that they might find evidence related to the crime for which Slone was arrested.

In *Gant*, the Court reminded lower courts that established precedent "authorizes police to search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." 129 S. Ct. at 1719; *see also New York v. Belton*, 453 U.S. 454, 461 (1981) (announcing the holding whose reach *Gant* clarified and explaining that officer safety provides the underlying rationale for the search-incident-to-arrest exception to the warrant requirement). Slone argues that he was neither unsecured nor within reaching distance of the passenger compartment when the search was conducted and that, therefore, the vehicle

evidence must be suppressed. However, Slone fails to grapple with the rest of the Court's decision.

Critically, the Court held in *Gant* that police may search the passenger compartment incident to arrest if a third, standalone criterion is satisfied—although that criterion had not been made clear by the Court's prior precedent. "[W]e also conclude that circumstances unique to the vehicle context justify a search incident to a lawful arrest *when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.*" *Id.* at 1719 (emphasis added). While a traffic arrest, for example, will not often furnish the basis for a search, in other cases the "offense of arrest" will supply a reasonable basis for searching a car's passenger compartment. *Id.; see also id.* at 1723-24 (clearly stating the case holding); *United States v. Stotler*, 591 F.3d 935, 939 (7th Cir. 2010) (discussing the Court's decision and its implications).

In this case, it was reasonable to believe that evidence related to the offense of arrest would be found in the passenger compartment, because agents had arrested Slone while he was in the process of conducting security or countersurveillance operations in a drug trafficking conspiracy. As the district court observed, officers "could have reasonably expected to find money, cell phones, maps, drawings, or other evidence linking the occupants of the red Dodge pickup to the crime." Slone's argument that the district court erred because the enumerated pieces of possible evidence "are not contraband, nor necessarily evidence of any crime," misperceives the

inquiry. The offense of arrest was conspiracy—evidence that the parties were engaged in a joint venture was what officers reasonably would have been seeking. *See United States v. Carrasco*, 887 F.2d 794, 807-08 (7th Cir. 1989) (conspiracy, which requires proof of an agreement to carry out illegal activity, may be proved by both direct and circumstantial evidence). Indeed, circumstantial evidence of an agreement to engage in drug trafficking activity is precisely what the officers found. *United States v. Harris*, 585 F.3d 394, 400 (7th Cir. 2009) (teaching that $8,900, an "exceedingly large quantity of cash," provided circumstantial evidence of involvement in drug trafficking). Therefore, the search incident to Slone's arrest was reasonable, and the vehicle evidence was properly admitted against him.

### III. Conclusion

For the foregoing reasons we AFFIRM the judgment of conviction.