In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-2028

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JADRION GRIFFIN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Indiana, Evansville Division.
No. 3:08CR00014-001—**Richard L. Young**, *Chief Judge.*

ARGUED FEBRUARY 8, 2011—DECIDED JULY 22, 2011

Before SYKES, TINDER, and HAMILTON, *Circuit Judges.*

SYKES, *Circuit Judge.* When two Indiana police officers attempted to stop a car matching the description of one reportedly involved in a road-rage incident, the driver Jadrion Griffin, initially showed signs of compliance. He then changed his mind and continued to drive, prompting a brief low-speed car chase. Griffin eventually pulled over, but not before leading the officers through a parking lot where he tossed a plastic bag containing 82 grams of crack into newly fallen snow.

Law-enforcement officers later obtained a federal warrant to search Griffin's home and there recovered additional crack cocaine and a loaded handgun. A federal grand jury indicted Griffin on a number of drug- and gun-related crimes. Griffin moved to suppress the evidence of the drugs recovered from the snowy parking lot. The district court denied the motion, and the government introduced the drug evidence at trial. The jury convicted Griffin of all but one of the counts charged. The court imposed a 360-month sentence.

On appeal Griffin claims he was illegally seized when he threw the crack in the snow and therefore the drug evidence should have been suppressed. He also raises two challenges to his sentence. He first claims that he should not have been sentenced as a career offender under section 4B1.1 of the sentencing guidelines because his prior conviction for vehicular flight under Indiana law is not a crime of violence. He also argues that he should be resentenced using the new crack-to-powder ratio prescribed by the Fair Sentencing Act of 2010 ("the FSA"), Pub. L. No. 111-220, 124 Stat. 2372.

We affirm. Griffin was not "seized" for Fourth Amendment purposes when he discarded the crack in the parking lot during the low-speed police chase, so the drug evidence was properly admitted at trial. Griffin's sentencing challenges are foreclosed by our precedent and by the Supreme Court's recent decision in *United States v. Sykes*, 131 S. Ct. 2267 (2011).

## I. Background

Shortly after midnight on February 3, 2007, two Indiana State Excise Police officers patrolling in an unmarked squad car in Evansville, Indiana, received a dispatch alerting them to a possible road-rage incident nearby. The dispatch was prompted by a 911 call reporting that a black male driving a blue GMC Yukon had just thrown something at another vehicle. The unidentified caller reported that the driver was last seen traveling north-bound on Fulton Avenue in Evansville. Not long after receiving this dispatch, the officers saw a blue Yukon traveling southbound on Fulton. They began following the Yukon, and although they did not observe any traffic violations or other signs of road rage, they decided to pull the vehicle over.

When the officers found a safe place to initiate the stop, they turned on their squad's emergency lights. The Yukon initially slowed and appeared to be pulling over, but then changed course and continued down the road. An Evansville police officer patrolling nearby heard a dispatch about the pursuit over his police radio and joined in the chase. The Evansville officer turned on his emergency lights and siren, but the Yukon continued to drive, passing through a red light in the process.

At some point the State Police officers turned on their siren as well. The Yukon still did not stop, so the officers activated their squad-car intercom and verbally com-manded the driver to pull over. The Yukon made a few evasive maneuvers—turning into an alley and cutting through a parking lot covered in freshly fallen snow—

before eventually complying. The pursuit lasted only about one minute. The officers later estimated that the Yukon traveled at 20 to 35 miles per hour during the chase.

After pulling over, Griffin got out of the Yukon and the officers arrested him for resisting law enforcement by vehicle and for several traffic offenses committed during the pursuit. They then searched the route Griffin had traveled during the chase. In the parking lot alongside the Yukon's fresh tire tracks in the snow, they found a plastic bag containing 82 grams of crack cocaine. Griffin was charged with felony drug offenses in Indiana state court and released on bond pending trial. Several months later, officers executed a federal search warrant at Griffin's home in Evansville. They recovered 26 grams of cocaine base, digital scales, a loaded .45-caliber hand- gun, a drug ledger, and $1,858 in cash.

A federal grand jury indicted Griffin based on the evidence recovered pursuant to the federal search warrant as well as the crack cocaine found in the snowy parking lot. The five-count indictment contained three drug charges pursuant to 21 U.S.C. § 841: conspiracy to distribute 50 or more grams of crack cocaine (Count I); possession with intent to distribute 50 or more grams of crack cocaine on the day of the low-speed car chase (Count II); and possession with intent to distribute five or more grams of crack cocaine on the day the search warrant was executed (Count III). The final two counts alleged violations of federal gun laws, specifically possession of a firearm in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count IV), and

unlawful possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1) (Count V).

Prior to trial Griffin moved to suppress the crack cocaine recovered from the parking lot immediately after the police pursuit. He claimed that this evidence should be excluded as the fruit of an illegal seizure because the State Police officers lacked reasonable suspicion to justify initiating the stop. The district court denied the motion.

A two-day jury trial ensued. The government introduced the drug evidence—including the 82 grams of crack recovered from the parking lot—over defense counsel's continuing objection. The jury convicted Griffin of all counts except Count IV, the charge of possessing a firearm in furtherance of a drug-trafficking crime.

At Griffin's sentencing hearing, the court calculated a guidelines base offense level of 34 after finding Griffin responsible for over 500 grams of crack cocaine in the course of the conspiracy. The court deducted two points based on its policy disagreement with the crack-to-powder disparity in the guidelines, but then determined that Griffin's prior convictions for battery with a deadly weapon and felony resisting law enforcement by vehicle qualified him as a career offender, which raised his offense level to 37. Based on this offense level and Griffin's criminal-history category of VI, the court calculated a guidelines range of 360 months to life. The court sentenced Griffin to concurrent terms of 360 months on Counts I and II, and 120 months on Counts III and V. Griffin appealed.

## II. Discussion

Griffin makes three arguments on appeal. He first claims that the crack cocaine found in the snowy parking lot should have been suppressed as the fruit of an illegal seizure. He argues that he is entitled to a new trial because the improper admission of this evidence tainted his entire trial. His other arguments relate to his sentence. He claims that the district court erred when it found him to be a career offender under the sentencing guidelines by counting his Indiana conviction for vehicular flight as a crime of violence. Finally, Griffin maintains that he should be resentenced using the more lenient crack-to-powder ratio set forth in the FSA.

## A. Griffin's Suppression Motion

Griffin argues that the crack cocaine found in the parking lot along the route of the police chase was the fruit of an unconstitutional seizure and the admission of this evidence at trial likely contributed to his convictions, entitling him to a new trial. We review the district court's denial of Griffin's motion to suppress under a split standard of review; the court's factual findings are reviewed for clear error and its legal conclusions are reviewed de novo. *United States v. Slone*, 636 F.3d 845, 848 (7th Cir. 2011).

The government's concessions in this case helpfully narrow our inquiry. "[W]hen police conduct an unreasonable search or seizure, the exclusionary rule usually vindicates the Fourth Amendment's protections by

kicking out the unlawfully obtained evidence," *id.*, and here the government does not claim that any exception to the exclusionary rule applies. As a general matter, a warrantless search or seizure is unreasonable unless supported by probable cause, *id.*, or in the case of an "investigatory stop of a vehicle," unless "articulable facts support a reasonable suspicion that criminal activity is afoot," *United States v. Drake*, 456 F.3d 771, 774 (7th Cir. 2006). The government simplified matters somewhat by conceding at oral argument that when the officers first activated their emergency lights, they did not have facts supporting a reasonable suspicion to justify stopping Griffin. As such, if by activating their emergency lights the officers "seized" Griffin, then the drugs that he discarded during the ensuing low-speed chase should have been suppressed as the product of an unconstitutional seizure. *See Slone*, 636 F.3d at 848.

If, on the other hand, the "seizure" for Fourth Amendment purposes did not occur until Griffin pulled over, then the district court's denial of suppression was correct; the evidence would not be the fruit of an unconstitutional seizure because Griffin discarded it prior to being seized. *See California v. Hodari D.*, 499 U.S. 621, 629 (1991) (Because the defendant "was not seized until he was tackled[, t]he cocaine abandoned while he was running was in this case not the fruit of a seizure, and his motion to exclude evidence of it was properly denied."). And by the time he pulled over, Griffin had committed a series of traffic and other offenses that gave the officers probable cause to arrest him. *See, e.g.,*

*Carmichael v. Vill. of Palatine, Ill.*, 605 F.3d 451, 456 (7th Cir. 2010) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." (quotation marks omitted)). Thus, whether the district court properly denied Griffin's motion to suppress hinges entirely on when the "seizure" for Fourth Amendment purposes occurred.

"[A] person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980). While an officer's application of physical force always constitutes a seizure, a "show of authority" alone is insufficient; an officer's show of authority becomes a seizure only if the person at whom it is directed actually submits to that authority. *Hodari D.*, 499 U.S. at 626. In other words, there are two kinds of seizures: those effected through physical force and those effected through a show of authority *and* "submission to the assertion of authority." *Id.* (emphasis omitted).

Here, the officers did not use physical force to induce Griffin to stop. Activating their emergency lights, however, unquestionably qualified as a show of authority, *see Brower v. County of Inyo*, 489 U.S. 593, 597-98 (1989), and it is undisputed that Griffin eventually submitted to their show of authority. The factual wrinkle in this case is that Griffin attempted to evade the officers before eventually submitting, and it was in the interim time period that he discarded the crack cocaine. In many cases there is no need to resolve ambiguity about when

a suspect is seized after an officer's initial show of author-ity because the suspect's submission closely follows, or the police resort to physical force when the suspect does not yield, or reasonable suspicion supports the initial show of authority. *See, e.g.*, *Gentry v. Sevier*, 597 F.3d 838, 843-45 (7th Cir. 2010) (finding that an officer seized the plaintiff by telling him to put his hands over his head, which the plaintiff did, without identifying precisely at what point the seizure occurred); *United States v. Robinson*, 537 F.3d 798, 801 n.2 (7th Cir. 2008) (explaining that because the officers had reasonable suspicion at the time of the show of authority, the court did not need to decide "precisely when Robinson was 'seized' for purposes of the Fourth Amendment"); *Tom v. Voida*, 963 F.2d 952, 957 (7th Cir. 2002) (holding that a plaintiff who failed to yield to a show of authority was not seized until the pursuing police officer "physi-cally touched him"). Here, however, the admissibility of the discarded drugs turns on when the seizure occurred, so the question cannot be avoided.

Griffin argues that if a suspect eventually yields to a show of authority by the police, the seizure begins for constitutional purposes upon the initial show of authority and continues until the suspect submits. He maintains, in other words, that a seizure does not neces-sarily occur at a discrete point in time but is better con-ceived of as a continuing event; on this view, the entire period of time between an officer's show of authority and the subject's submission to it constitutes the "sei-zure" for Fourth Amendment purposes. Applying this conceptualization here, Griffin contends that the seizure

began when the officers activated their emergency lights and was completed when he submitted; the whole course of conduct counts as a seizure under the Fourth Amendment.

This argument is in direct conflict with *Hodari D.*, in which the Supreme Court clarified that a "'seizure is a single act, and not a continuous fact.'" 499 U.S. at 625 (quoting *Thompson v. Whitman*, 85 U.S. (18 Wall.) 457, 471 (1874)); *see also Lee v. City of Chicago*, 330 F.3d 456, 462 (7th Cir. 2003) ("[A]t the time of the [Fourth A]mendment's drafting, the word 'seizure' was defined as a temporally limited act . . . ." (citing OXFORD ENGLISH DICTIONARY (2d ed. 1989))). *Hodari D.* rejected the proposition that once a suspect has been seized through the application of physical force, "there is a *continuing* arrest during the period of fugitivity" if the citizen "br[eaks] away and . . . *then* cast[s] away the [drugs]." 499 U.S. at 625. Griffin's seizure-as-a-continuum theory is, therefore, unfounded.

On this point our decision in *United States v. Bradley*, 196 F.3d 762 (7th Cir. 1999), contains dicta that requires some clarification. In *Bradley* a police officer activated his unmarked squad's emergency lights to stop a car that had rolled through a stop sign, but the driver did not pull over. *Id.* at 765. The officer then drew his service revolver and fired a warning shot in the air. When the driver still did not pull over, the officer fired a shot into the car. *Id.* The bullet lodged in the driver's seat, which finally induced the driver to stop. *Id.* at 765-66. In upholding the officer's conviction for use of excessive force in violation of the Fourth Amendment, *see id.* at 767-71,

we held that the "gunshot into [the] station wagon constituted a seizure under the Fourth Amendment," *id.* at 768.

Our holding in *Bradley* follows directly from *Hodari D.*—the gunshot plainly constituted a seizure effected by the officer's use of physical force. *See Hodari D.*, 499 U.S. at 625 ("[A]n arrest is effected by the slightest application of physical force . . . ."). However, *Bradley* also problematically (and unnecessarily) suggested that "a Fourth Amendment seizure of a fleeing suspect is not . . . an isolated moment" but can span the time between the use of force and the time the suspect stops attempting to escape. 196 F.3d at 768.[1] We quoted from a Third Circuit

---

[1] *Bradley* appears to suggest that *California v. Hodari D.*, 499 U.S. 621 (1991), stands for the proposition that a use-of-force seizure occurs only if the "use of force . . . cause[s] the fleeing individual to stop attempting to escape." *United States v. Bradley*, 196 F.3d 762, 768 (7th Cir. 1999). This misses an important nuance in *Hodari D.* The Supreme Court explained that a seizure through use of force occurs the moment force is applied. 499 U.S. at 626 ("The word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful."). But as we have noted, the Court also rejected the notion that such a seizure is a "continuum" if the suspect breaks away and only later submits. *Id.* at 625-26. The seizure in *Bradley* occurred when the officer fired a gunshot into the car even though it took a minute for the driver to pull over, *see* 196 F.3d at 767, and there was no need to imply the existence of a continuing-seizure theory to decide the case.

opinion stating that "'a "seizure" can be a process, a kind of continuum, and is not necessarily a discrete moment of initial restraint.'" *Id.* at 767 (quoting *United States v. Johnstone*, 107 F.3d 200, 206 (3d Cir. 1997)). This language cannot be squared with *Hodari D.*'s emphatic statement that a "'seizure is a single act, and not a continuous fact.'" 499 U.S. at 625 (quoting *Thompson*, 85 U.S. at 471). Accordingly, *Bradley* is properly understood to stand for the proposition that a gunshot fired into a fleeing car is a forcible seizure; it should not be read as support for the proposition that a seizure is a "continuum" that can span the time between a show of authority and a surrender, as Griffin suggests.

Here, the officers did not use force, and without his seizure-as-a-continuum theory, Griffin is left with two discrete points at which the seizure could have been effected: when the police initially activated their emergency lights or when he yielded to their show of authority. Griffin concedes that under *Hodari D.* a seizure cannot occur *unless* a suspect submits; he denies, however, that a seizure cannot occur *until* the suspect submits. The reasoning of *Hodari D.* forecloses this argument, which is really just a variation on the "continuum" theme.

*Hodari D.* held that submission to a show of authority is a necessary element of a seizure; the Court explained that while a suspect is still fleeing (as Griffin was when he discarded the drugs), he is not seized. *See* 499 U.S. at 626 ("The word 'seizure' . . . does not remotely apply . . . to the prospect of a policeman yelling 'Stop, in the name of the law!' at a fleeing form that continues to flee."). If a

suspect is not seized during the entire time he is being pursued by police, then the seizure does not occur until he submits to the show of authority or the pursuing officer resorts to force to stop the suspect's flight. The Court made the forcible-seizure part of this reasoning explicit, explaining that when Hodari ignored an initial show of authority and the pursuing officer had to use force, the seizure did not occur "until he was tackled." *Id.* at 629. That is, a seizure by physical force following a show of authority occurs when force is applied; it does not relate back to the initial show of authority. Similarly, a seizure by submission following a show of authority occurs when the suspect submits and does not relate back to the initial show of authority.[2] Contrary to Griffin's argument, a seizure by show of authority does not occur *unless* and *until* the suspect submits.

This conclusion is consistent with several of our cases applying *Hodari D*. In *Kernats v. O'Sullivan*, 35 F.3d 1171 (7th Cir. 1994), we noted that "[u]nder [the *Hodari D.*]

---

[2] Indeed, the dissent in *Hodari D.* understood this to be part of the majority's holding: "The Court today defines a seizure as commencing, not with egregious police conduct, but rather with submission by the citizen." 499 U.S. at 647 (Stevens, J., dissenting). Justice Stevens anticipated that in a situation like the one in this case where there is "a significant time interval between the initiation of the officer's show of force and the complete submission by the citizen," under the majority's holding, "the timing of the seizure is governed by the citizen's reaction, rather than by the officer's conduct." *Id.* at 643 (Stevens, J., dissenting).

test, a fleeing suspect—even one who is confronted with an obvious show of authority—is not seized until his freedom of movement has been terminated by an intentional application of physical force or by the suspect's submission to the asserted authority." *Id.* at 1178 n.4. We repeated this language again a few years later in *United States v. $32,400.00, in U.S. Currency*, 82 F.3d 135, 139 (7th Cir. 1996). Simply put, a seizure effected by a show of authority occurs when the suspect submits.

Griffin discarded the drugs during the low-speed police chase before he submitted to the officers' show of authority—that is, before he was "seized" for Fourth Amendment purposes. Accordingly, the drug evidence found in the parking lot was not the fruit of an unconstitutional seizure, and the district court properly denied Griffin's motion to suppress. *See Hodari D.*, 499 U.S. at 629.

**B. Griffin's Sentence**

Griffin raises two challenges to his sentence. He claims that the district court improperly classified him as a career offender under the sentencing guidelines. He also maintains that he should be resentenced because the FSA applies retroactively and because the date for determining retroactivity should be the date of final judgment.

*1. Career Offender Status*

Griffin claims he was erroneously classified as a career offender under the guidelines based in part on his

Indiana conviction for vehicular flight, which he con-
tends does not qualify as a crime of violence under
section 4B1.2(a) of the guidelines. He maintains he is
entitled to be resentenced using the guidelines range
that would have applied without the career-offender
enhancement.

At the time Griffin filed his appeal, circuit precedent
foreclosed this argument; we have previously held that
a conviction for vehicular flight under Indiana law,
IND. CODE § 35-44-3-3(b)(1)(A), is a crime of violence.[3] *See*
*United States v. Spells*, 537 F.3d 743 (7th Cir. 2008); *United*
*States v. Sykes*, 598 F.3d 334 (7th Cir. 2010). When this case
was argued, however, *Sykes* was pending before the
Supreme Court, *see Sykes v. United States*, 131 S. Ct. 2267
(2011), so we held this case in abeyance awaiting the
Court's decision. That decision has now been issued, and

---

[3] It is not entirely clear from the conviction records intro-
duced by the government whether Griffin was convicted of
violating Indiana Code § 35-44-3-3(b)(1)(A), which makes it a
Class D felony to use a vehicle to resist arrest, or Indiana Code
§ 35-44-3-3(b)(1)(B), which also characterizes as a Class D
felony operating a vehicle in a way that creates a substantial
risk of bodily injury while resisting arrest. The documentary
record reveals only that Griffin was convicted of a Class D
felony resisting law enforcement by vehicle without specifying
which form of the Class D felony offense he committed.
Griffin concedes that the offense specified in subsection (b)(1)(B)
is a crime of violence; his argument on appeal is that felony
vehicular flight under subsection (b)(1)(A) is not a crime
of violence.

the Court has confirmed that "[f]elony vehicle flight," as set forth in Indiana Code § 35-44-3-3(b)(1)(A), is a violent felony for purposes of the Armed Career Criminal Act ("ACCA"). *Id.* at 2277. Using the categorical approach to determine whether the offense is a crime of violence under the ACCA, the Court held that felony vehicular flight under Indiana law is inherently risky and falls within the ACCA's residual clause as "'conduct that presents a serious potential risk of physical injury to another.'" *Id.* at 2273 (quoting 18 U.S.C. § 924(e)(2)(B)(ii)). The Court rejected as "unconvincing" an argument identical to Griffin's here: that because Indiana separately "criminalizes flight in which the offender 'operates a vehicle in a manner that creates a substantial risk of bodily injury to another person,'" *id.* at 2276 (quoting IND. CODE § 35-44-3-3(b)(1)(B)), it must not have intended "subsection (b)(1)(A)'s general prohibition on vehicle flight to encompass the particular class of vehicle flights that subsection (b)(1)(B) reaches," *id.* The Court found significant that "Indiana treats violations of subsections (b)(1)(A) and (b)(1)(B) as crimes of the same magnitude," concluding from this fact that subsection (b)(1)(B) does not punish a separate, more risky class of vehicle flights. *See id.* at 2276-77. Rather, the Court held, subsection (b)(1)(A) reflects a judgment that when flight using a vehicle is involved, there is no need to independently prove that fleeing from an officer creates a substantial risk of bodily injury. *See id.*

The Supreme Court's decision in *Sykes* leaves Griffin without a leg to stand on. Although Indiana amended its vehicular-flight statute in 2006 to establish dif-

ferent penalties for violations of subsections (b)(1)(A) and (b)(1)(B)—making it possible to construe the majority holding in *Sykes* as limited "to [Indiana's] vehicular flight statute as it existed from 1998 to 2006," *see id.* at 2295 (Kagan, J., dissenting)—that is not a complication here because Griffin's predicate conviction for vehicular flight occurred in 2003. And although Griffin was sentenced as a career offender under the guidelines and not as an armed career criminal under the ACCA, *see id.* at 2270, the definition of "violent felony" under the ACCA is the same as the definition of "crime of violence" in section 4B1.2 of the guidelines, and "[i]t would be inappropriate to treat identical texts differently just because of a different caption," *United States v. Templeton*, 543 F.3d 378, 380 (7th Cir. 2008). Accordingly, the district court properly sentenced Griffin as a career offender under the guidelines.

### 2. Fair Sentencing Act

Finally, Griffin argues that he is entitled to resentencing under the FSA, but this argument also runs up against circuit precedent. Griffin contends that the FSA should apply retroactively, but we held in *United States v. Bell*, 624 F.3d 803 (7th Cir. 2010), and have confirmed in subsequent cases, that the FSA does not apply retroactively pursuant to the federal savings statute, 1 U.S.C. § 109. *See, e.g.*, *United States v. Fisher*, 635 F.3d 336, 340 (7th Cir. 2011); *Bell*, 624 F.3d at 814-15. Griffin maintains that the federal savings statute applies only to acts that repeal statutes, not acts like the FSA that merely amend statutes,

but we rejected that precise argument in *Bell*. *See Bell*, 624 F.3d at 814.

Alternatively, Griffin argues that because his case was pending on appeal when the FSA went into effect, he is entitled to be resentenced in accordance with its new crack-to-powder ratios. As we recently held in *Fisher*, however, "the relevant date for a determination of retroactivity" is not the date the judgment becomes final or even the date of sentencing, but "the date of the underlying criminal conduct." 635 F.3d at 340. Because the FSA was signed into law on August 3, 2010, long after Griffin's underlying criminal conduct, it has no bearing on his sentence.[4]

---

[4] Moreover, Griffin admits that even if the FSA applied to him, it would not change his statutory sentencing range for his most serious offense (on Count I, the conspiracy count), and his other terms of imprisonment were ordered to run concurrently. Under the new crack-to-powder ratio in the FSA, Griffin would be subject to the same statutory sentencing range on Count I if he were responsible for at least 280 grams of crack, *see* 21 U.S.C. § 841(b)(1)(A)(iii), and the district court found him responsible for more than 500 grams. Because an adjustment to the statutory range for the other drug counts (Counts II and III) based on the new crack-to-powder ratio would not augment Griffin's total punishment, even if the FSA applied, there would be no need to consider its impact on his statutory range for those other counts. *See United States v. Brough*, 243 F.3d 1078, 1081 (7th Cir. 2001). Griffin maintains that the concurrent-sentence doctrine does not apply to him because the court imposed a special monetary assessment on

(continued...)

Finally, we note that Griffin is ineligible for a sentence reduction under 18 U.S.C. § 3582(c)(2) based on the Sentencing Commission's amendments to the crack-cocaine guidelines, which the Commission made retroactive effective November 1, 2011 (absent congressional action to the contrary). *See* News Release, U.S. Sentencing Commission, U.S. Sentencing Commission Votes Unanimously to Apply Fair Sentencing Act of 2010 Amendment to the Federal Sentencing Guideslines Retroactively (June 30, 2011), *available at* http://www.ussc.gov/Legislative_and_Public_Affairs/Newsroom/Press_Releases/20110630_Press_Release.pdf. Because the amendments leave the career-offender guideline unchanged and Griffin's offense level of 37 and criminal-history category of VI were based on that guideline, *see* U.S.S.G. § 4B1.1(b), the amendments do not affect Griffin's applicable guidelines range of 360 months to life.[5] Accordingly, Griffin was not sentenced

---

[4]  (...continued)

Counts II and III. But we rejected an identical argument in *Brough*, explaining that "[a]lthough the $100 special assessment means that a court must consider every challenge to the propriety of a *conviction*," as long as the court has upheld the convictions, and hence the validity of the special assessments (as we have here), "[t]here is no need to go further and consider matters that do not affect the total sentencing package." *Id.* (emphasis added) (citing *Ray v. United States*, 481 U.S. 736 (1987)).

[5]  The career-offender guideline stipulated an offense level of 37 because Griffin's statutory maximum sentence on Counts I,

(continued...)

"based on a sentencing range that has subsequently been lowered by the Sentencing Commission," 18 U.S.C. § 3582(c)(2), and he will not be eligible for a reduction under § 3582(c)(2) when the amendments become retroactive. *See* U.S.S.G. § 1B1.10 cmt. n.1(A) ("[A] reduction in the defendant's term of imprisonment is not authorized under 18 U.S.C. § 3582(c)(2) and is not consistent with this policy statement if . . . an amendment listed in subsection (c) is applicable to the defendant but the amendment does not have the effect of lowering the defendant's applicable guideline range because of the operation of another guideline. . . ."); *United States v. Forman*, 553 F.3d 585, 590 (7th Cir. 2009) (holding that because the defendant's guidelines range remained the same after a retroactive guidelines amendment due to his career-offender status, the amendment did not "have the effect of lowering the defendant's applicable guideline range because of the operation of another guideline'—namely the career-offender provision" (quoting U.S.S.G. § 1B1.10 cmt. n.1(A))).

AFFIRMED.

---

[5] (...continued)
II, and III was life in prison. *See* U.S.S.G. § 4B1.1(b); *see also* 21 U.S.C. § 841(b)(1)(A)(ii), (b)(1)(B)(iii) (2009). Combined with the criminal-history category of VI prescribed for all career offenders, U.S.S.G. § 4B1.1(b), this offense level results in a guidelines range of 360 months to life, *see* U.S.S.G. § 5A (Sentencing Table).