KANNE, Circuit Judge.
Law enforcement officers in Warren County, Illinois, arrested Matthew Martin after discovering illegal drugs and a firearm in his vehicle. Shortly after his arrest, Martin was advised of his Miranda rights and interviewed by Chief Deputy Bruce Morath of the Warren County Sheriffs Department. At one point during the interview, Deputy Morath asked Martin if he would be interested in providing a written statement. Martin responded, “I’d rather talk to an attorney first before I do that.” Deputy Morath ended the interview and took Martin to the booking area for processing. Approximately two to three hours later, detectives from Burlington, Iowa, arrived at the Warren County Sheriffs Department to interview Martin about a recent robbery. They advised Martin of his Miranda rights but were never informed of his prior request to speak to an attorney. Prior to trial, Martin moved to suppress statements he made during this second interview. After an evidentiary hearing, the district court denied his motion. Because we find Martin’s invocation of his Fifth Amendment right to *686 counsel was limited to written statements, we affirm the judgment of the district court.
I. Background
On the morning of November 9, 2009, two black males robbed the Farmers & Merchants Bank in Burlington, Iowa. The robbers wore yellow hard hats, tool belts, coveralls, and dust masks to partially conceal their faces. One of the robbers displayed a handgun while forcing a teller to take him to the vault area of the bank. The two men left with approximately $44,000 in cash.
The following day Burlington officers received several tips indicating that one of the robbers might be Daryl Jackson. During an interview with Burlington detectives, Jackson denied any involvement but identified Matthew Martin as one of the robbers. Jackson explained that he and Martin met while incarcerated in Indiana. Martin contacted Jackson by telephone a couple of weeks prior to the robbery, indicating that he wanted to rob a bank in Burlington. After Martin arrived in Burlington a few days before the robbery, he met with Jackson to discuss his plans in greater detail. Martin described wearing construction equipment during the robbery and told Jackson he had a gun located underneath the hood of his red SUV. Martin called Jackson after the robbery and told him they stole approximately $50,000 in cash.
After interviewing Jackson, Burlington detectives contacted authorities in Indiana to learn more about Martin, including information about any prior robbery convictions. Among other useful information, Indiana police officers provided Burlington detectives with Martin’s photograph. His appearance in the photograph was consistent with the bank’s surveillance footage. The Burlington detectives’ investigation also revealed that Martin stayed at a local Super 8 motel for two nights prior to the robbery. One of the housekeepers at the Super 8 told officers that she observed four black males exiting a room and two of these men were wearing yellow hard hats. The housekeeper positively identified Martin as one of the men wearing a hard hat.
On November 19, 2009, the front desk clerk at the Super 8 contacted Burlington detectives to report that Martin recently checked into the hotel. Burlington detectives began conducting surveillance on Martin and attached a GPS tracking device to his vehicle, a gray Monte Carlo with Illinois temporary tags, registered to Martin’s sister.
The following Monday, November 23, 2009, the GPS unit on Martin’s car malfunctioned, which prevented detectives from tracking Martin for a short period of time. After the GPS unit resumed proper functioning, Burlington detectives discovered that Martin was driving eastbound in Illinois. The detectives pursued Martin and contacted law enforcement officers in Illinois for additional assistance. Martin entered Warren County, Illinois, before officers were able to conduct a traffic stop. The Warren County Sheriffs Department was apprised of the situation and Chief Deputy Bruce Morath responded to the scene of the traffic stop.
At the time Deputy Morath arrived, officers were conducting a search of Martin’s vehicle. The officers discovered small quantities of marijuana and cocaine in the passenger compartment and a silver revolver under the hood of the car.[1] Deputy *687 Morath arrested Martin for possession of a firearm by a felon, possession of cannabis, and possession of a controlled substance. Deputy Morath transported Martin to the Warren County Sheriffs Department.
At the sheriffs department, Deputy Morath read Martin his Miranda rights prior to questioning him. Martin acknowledged that he understood those rights and agreed to speak with law enforcement officers. Deputy Morath asked Martin various questions about ownership of the Monte Carlo and Martin’s knowledge of the drugs and gun. Deputy Morath stated at the suppression hearing that the sole purpose of his interview was to substantiate the charges brought against Martin based on the items found in his car. Martin admitted he was a convicted felon but denied knowledge of the drugs and gun found in the vehicle. Following these denials, Deputy Morath asked Martin if he would be interested in providing a written statement. According to Deputy Morath’s testimony at the suppression hearing, Martin responded, “I’d rather talk to an attorney first before I do that.”[2] (Tr. at 106.) Deputy Morath ended the interview and returned Martin to the lock-up. Deputy Morath, whose shift was ending, wrote his report and submitted a copy to the Sheriff and the state’s attorney before leaving. He did not speak with the Burlington detectives.
Burlington detectives Schwandt and Thompson arrived at the Warren County Sheriffs Department approximately two to three hours after the traffic stop to question Martin about his involvement in the robbery. They first met with the Warren County Sheriff, who informed them that Martin denied knowledge of the items recovered from the vehicle. They were not informed, however, that Martin requested to speak with an attorney. The detectives advised Martin of his Miranda rights for the second time. Martin again waived these rights and agreed to speak with the two detectives. Martin thereafter admitted that he loaned a gun to Jackson, who returned it to him by placing it under the hood of the vehicle. Detectives Schwandt and Thompson never requested a written statement and Martin did not ask to speak to an attorney during this interview.
II. Analysis
Martin argues that the statements elicited from him during his interview with the Burlington detectives should be suppressed because he invoked his Fifth Amendment right to counsel prior to this interview. In reviewing the district court’s denial of Martin’s motion to suppress, we review factual findings for clear error and legal conclusions de novo. United States v. Griffin, 652 F.3d 793, 797 (7th Cir.2011).
Law enforcement officers are free to question a suspect who waives his right to counsel after receiving Miranda warnings. Davis v. United States, 512 U.S. 452, 458, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). But a suspect may still invoke his right to counsel after an initial waiver if he does so unambiguously. See id. at 458-59, 114 S.Ct. 2350. “[A]n accused ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself *688 initiates further communication, exchanges, or conversations with the police.” Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 878 (1981). The Edwards rule is non-offense specific and prohibits police from interrogating a suspect regarding any offense after the suspect invokes his Miranda rights. McNeil v. Wisconsin, 501 U.S. 171, 177, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) (citing Arizona v. Roberson, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988)).
Whether a suspect invokes his right to counsel is an objective inquiry which requires, “ ‘at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.’ ” Davis, 512 U.S. at 459, 114 S.Ct. 2350 (quoting McNeil, 501 U.S. at 178, 111 S.Ct. 2204). If a request is ambiguous or equivocal, police officers may continue questioning a suspect. Id.
The Edwards rule serves as an absolute prohibition on further interrogation only if an accused invokes his right to counsel for all purposes. See Connecticut v. Barren, 479 U.S. 523, 529-30, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987); accord United States v. Spruill, 296 F.3d 580, 588 (7th Cir.2002) (suspect’s request for an attorney if he took a polygraph exam was a “conditional request”). In Barrett, the defendant on three occasions indicated he would not make a written statement without counsel present, but “he had no problem in talking about the incident.” 479 U.S. at 525, 107 S.Ct. 828. Upon his arrival at the police station, Barrett was advised of his Miranda rights and acknowledged that he understood those rights. Id. He stated that he would not give a written statement but would talk to the police officers. Id. Thirty minutes later, Barrett was again advised of his rights and acknowledged he understood those rights. Id. He repeated his earlier statement that he would not provide a written statement without an attorney but had “no problem” talking to the officers. Id. Barrett then provided an oral confession. See id. After police officers discovered their recording device malfunctioned, they advised Barrett of his rights for a third time and Barrett stated that he was still willing to talk but would not put anything in writing until his attorney arrived. Id. at 525-26, 107 S.Ct. 828. He then repeated his confession. Id. at 526, 107 S.Ct. 828.
The Supreme Court held that Barrett’s statements were unambiguous, his intentions were clear, and the police honored those intentions. Id. at 529-30, 107 S.Ct. 828. Noting that the proper approach to questions of waiver “ ‘requires us to give a broad, rather than a narrow, interpretation to a defendant’s request for counsel,’ ” the Supreme Court held that no such interpretation was necessary because the defendant’s statements served as an unequivocal waiver of his right to counsel during oral interrogation. See id. at 529-30, 107 S.Ct. 828 (quoting Michigan v. Jackson, 475 U.S. 625, 633, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), overruled by Montejo v. Louisiana, 556 U.S. 778, 129 S.Ct. 2079, 173 L.Ed.2d 955 (2009)).
The sole question in this case is whether Martin’s statement, “I’d rather talk to an attorney first before I do that,” served as an absolute prohibition on further interrogation or was limited in its scope to written statements. The district court held that Martin’s statement was unambiguous and “cannot be fairly construed as an unqualified invocation of his Miranda rights.” (Tr. at 190.) The district court noted that Martin had previously waived his Miranda rights, answered all of Deputy Morath’s questions, and was directly responding to a request to make a written statement at the time he invoked his right *689 to counsel. Thus, given the context, the district court found that Martin’s invocation was not an absolute prohibition.
We agree with the district court. Martin’s statement is unambiguous in light of the circumstances and is clearly limited to written statements. This case differs from those cases described in Barrett requiring a court to give “broad effect to requests for counsel that were less than all-inclusive.” 479 U.S. at 529, 107 S.Ct. 828 (citing Oregon v. Bradshaw, 462 U.S. 1039, 1041-42, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) (“I do want an attorney before it goes very much further.”); Edwards, 451 U.S. at 479, 101 S.Ct. 1880 (“I want an attorney before making a deal.”)). Here, Deputy Morath clearly asked Martin if he would provide a written statement. In response, Martin invoked his right to counsel “before I do that.” His request for counsel was unambiguous and the phrase “before I do that” operates as a clear limitation of that request. “To conclude that [Martin] invoked his right to counsel for all purposes requires not a broad interpretation of an ambiguous statement, but a disregard of the ordinary meaning of [Martin’s] statement.” Id. at 529-30, 107 S.Ct. 828.
Martin argues that this case is governed by Edwards, not Barrett. He asserts that his case differs significantly from Barrett in that he never affirmatively expressed a desire to continue speaking with law enforcement officers without an attorney present. We can infer from Martin’s actions, however, that he was not unwilling to do so. At the beginning of the interview, Martin was apprised of his Miranda rights and signed a waiver indicating that he was willing to talk to Deputy Morath. He freely answered all of Deputy Morath’s questions. At what may be reasonably interpreted as the conclusion of the interview, Deputy Morath asked Martin if he would provide a written statement. Martin stated he would rather talk to an attorney “before I do that.” Deputy Morath ceased questioning, either because the interview was over[3] or because Martin requested an attorney. Thereafter, Martin signed an additional waiver of his Miranda rights and agreed to speak with the Burlington detectives.[4] There is no indication that Martin “did not feel sufficiently comfortable with the pressures of custodial interrogation to answer questions without an attorney.” Roberson, 486 U.S. at 684, 108 S.Ct. 2093.
As noted in Barrett, the prohibition of further questioning after a suspect invokes his right to counsel is intended to prevent police coercion. See 479 U.S. at 528, 107 S.Ct. 828. In this case, there is no evidence of mischief by the officers or any indication that Martin was coerced *690 into providing statements to either Deputy Morath or the Burlington detectives. Rather, any alleged error by the law enforcement officers appears to derive from a simple, although troubling, lack of communication. But despite this failure to communicate, Martin did not suffer a constitutional deprivation. His invocation of the right to counsel was clearly limited in its scope to written statements. Martin did not provide a written statement, nor did officers request one, after he invoked his right to counsel.
III. Conclusion
Because Martin’s request for counsel was limited to written statements, the judgment of the district court is Affirmed.

. At the suppression hearing, Martin challenged the legality of the officers' search under the hood of the car. The district court found that there was probable cause to search pursuant to Arizona v. Gant, 556 U.S. 332, *687 129 S.Ct 1710, 173 L.Ed.2d 485 (2009). Martin did not appeal this ruling.

. Deputy Morath’s report, completed shortly after his interview with Martin, states: “R.O. then asked Martin if he wanted to write a statement of what he knew about the incident. Stated he wanted to talk to an attorney before he did that.” (Tr. at 120.)

. Deputy Morath acknowledged that his purpose in interviewing Martin was to elicit statements supporting the drug and gun charges. This included whether Martin was the driver of the vehicle and whether he owned the items found within the vehicle. Prior to Deputy Morath’s request for a written statement, Martin admitted he was the driver of the car (which belonged to his sister), admitted to being a convicted felon, and denied knowledge of the drugs and gun located within the vehicle. Deputy Morath then asked Martin "if he had anything else to say.” (Tr. at 106.) Only after these questions were asked and answered did Deputy Morath ask Martin to provide a written statement.

. Martin’s conversation with the Burlington detectives is helpful only in supporting the inference that Martin was willing to speak with authorities. Such evidence cannot establish that Martin waived his right to counsel. See Edwards, 451 U.S. at 484, 101 S.Ct. 1880 ("[A] valid waiver of that right cannot be established by showing only that [the accused] responded to further police-initiated custodial interrogation even if he has been advised of his rights.”).