**Howard R. WILLARD,
Petitioner-Appellant,**

v.

**Linley PEARSON, Attorney General, Indiana, and Raymond J. Lippman, Warden, United States Penitentiary, Terre Haute, Indiana, Respondents-Appellees.**

No. 84–1893.

United States Court of Appeals, Seventh Circuit.

Submitted Jan. 8, 1987.[*]

Decided July 9, 1987.

---

\* This case was originally set for oral argument on January 8, 1987. However, the parties agreed to, and the court allowed, submission of the case on the briefs and record.

William C. Erbecker, Indianapolis, Ind., for petitioner-appellant.

Kermit R. Hilles, Deputy Atty. Gen., Indianapolis, Ind., for respondents-appellees.

Before COFFEY and MANION, Circuit Judges, and PARSONS, Senior District Judge.**

MANION, Circuit Judge.

An Indiana jury convicted petitioner-appellant, Howard Willard, of eight felonies: conspiracy to commit a felony (first degree burglary); two counts of first degree burglary; two counts of commission of a felony while armed (robbery); first degree murder; conspiracy to commit a felony (arson); and first degree arson. The felony convictions arose from the shooting death of Marjorie Jackson, the theft of large amounts of money from her home, and burglaries and arson of her home. The Indiana Supreme Court affirmed Willard's conviction on direct appeal. *Willard v. State*, 272 Ind. 589, 400 N.E.2d 151 (1980).

** Honorable James B. Parsons, Senior District Judge for the Northern District of Illinois, sitting by designation.

Willard filed a petition for habeas corpus under 28 U.S.C. § 2254 in the Southern District of Indiana, raising the same issues he raised in his state appeal. The district court denied Willard's petition and Willard appeals. We affirm.

## I. FACTS

On May 7, 1977, Marion County sheriff's police arrived at Marjorie Jackson's home in Indianapolis, Indiana. Parts of the home were on fire, and smoke poured through the front of the house. Sheriff's deputies found the doorway to the home ajar. The door showed signs of forced entry. Deputies found Marjorie Jackson's body on the kitchen floor. An autopsy later revealed that Mrs. Jackson had died from a gunshot wound to the abdomen inflicted two to four days before the fire. The home was in disarray, and deputies found large amounts of cash about the home in sacks and tool boxes. Further investigation revealed the fire was deliberately set.

Marjorie Jackson, the victim, was a wealthy old widow whom one could fairly characterize as eccentric. One of Mrs. Jackson's quirks was an extreme distrust of banks that arose after a bank employee embezzled approximately $700,000 from her account. After the embezzlement, Mrs. Jackson decided to keep all her money at home, in cash.

During January through May, 1976, Mrs. Jackson withdrew $6,400,000 from Indiana National Bank. At Mrs. Jackson's request, Indiana National paid her the cash in twenty and one-hundred dollar bills; Indiana National obtained the cash from the Federal Reserve Bank in Chicago. Mrs. Jackson kept this money hidden in various places in her home.

Willard, along with several other people, learned that Marjorie Jackson kept large amounts of cash in her home. Willard told several people that he was interested in burglarizing the "witch's house" (Willard's term for the Jackson home). In early May, 1977, Willard and Manuel Robinson broke into the Jackson home several times and stole large amounts of money. During one of the burglaries, Mrs. Jackson confronted Willard and Robinson; Robinson shot Mrs. Jackson. Willard later threw the rifle used in the shooting into the White River. A few days after the shooting, to disguise Marjorie Jackson's murder and destroy any evidence they might have left, Willard and Robinson returned to the Jackson home and set it afire.

From May 2 through May 6, 1977, Willard and Marjorie Pollitt, Willard's ex-wife, made several large cash deposits in two Mooresville, Indiana banks. That same week (the week in which the burglaries, murder, and arson took place) Willard and Pollitt generously spent large sums of cash. Part of this spending spree included Willard's purchasing a new Lincoln Continental for $15,000 cash.

FBI agents apprehended Willard and Pollitt in Arizona. After arresting the pair, the FBI agents secured the motorhome that Willard and Pollitt had recently purchased and in which Willard and Pollitt were staying, obtained a search warrant from a federal magistrate, and searched the motorhome. The search turned up, among other things, large amounts of cash. Unfortunately for Willard, the Federal Reserve Bank had recorded the serial numbers of the bills it transferred to Indiana National Bank. The serial numbers of the bills the FBI agents discovered in the motor home matched the serial numbers of some of the bills that Indiana National Bank had transferred to Marjorie Jackson.

Willard filed a motion to quash the search warrant and suppress the evidence obtained in the search. The trial judge denied Willard's motions. On appeal, the Indiana Supreme Court affirmed the trial court's ruling. 272 Ind. at 592–94, 400 N.E.2d at 154–55.

Marjorie Jackson's murder and the surrounding circumstances generated fairly extensive media coverage. The media coverage was most extensive in central Indiana but also reached across all of Indiana and, to some extent, the entire United States. While the media did not ignore Willard and the other defendants, much, if not most, of the media attention

centered around Marjorie Jackson. The media was naturally intrigued by Marjorie Jackson's bizarre lifestyle and the fact that she kept millions of dollars in cash hidden in her home.

Media interest continued throughout Willard's trial itself. The trial judge allowed the trial to be videotaped, and disseminated the tapes to the media for public broadcast. Three cameras were used for videotaping: two cameras permanently installed on the courtroom's side walls and one portable camera stationed in the spectator gallery. All three cameras were operated from outside the courtroom. The videotaping itself was not unusual; the trial judge had allowed taping of numerous trials for educational and court administrative purposes.

Willard had consented to the taping but objected to the court's proposal to disseminate the tapes to the media for public broadcast. Over Willard's objection, the trial judge disseminated the tapes to the media but he did not allow the media to broadcast tapes of any proceedings until after the jury had been selected and sequestered. The trial judge also issued rules regulating the media's conduct during the trial. The trial judge allowed the media to take film or photographs through the courtroom window. The trial judge also allowed the media to take film or photographs anywhere outside the courtroom, as long as the photographers used "discretion and good taste." The trial judge did not allow the media to take film or photographs inside the courtroom during trial. Willard does not allege that the media violated any of the trial judge's rules.

During trial, the trial judge received a letter from the Indiana Judicial Nominating Commission. The letter informed the judge that allowing the media to broadcast, televise, or record trial proceedings, or take pictures in areas immediately adjacent to the courtroom, violated Canon 3A(7) of the Code of Judicial Conduct. Upon learning about the letter, Willard moved for a mistrial. The trial judge concluded that his actions had not prejudiced Willard and denied Willard's motion. However, the court did stop all videotaping and photographing of the proceedings.

Sometime during the trial, after the evidence was in but before deliberations, the jury, with the trial judge's permission, was given a routine visitors' tour of parts of the Marion County Jail. Earlier during the trial, the jury had been given tours of museums and other public institutions that they had collectively agreed to visit. Apparently, the jury desired to tour the jail; the trial judge, considering the jail tour just another routine tour of a public institution, consented. Willard's trial counsel found out about the tour a few days after the jury reached its verdict. He promptly filed a motion for mistrial or in the alternative to set aside the jury's verdict. After a hearing on the issue, the trial judge concluded the jury's touring the jail did not prejudice Willard, and denied Willard's motion.

## II. DISTRICT COURT'S JURISDICTION —28 U.S.C. § 2254's "IN CUSTODY" REQUIREMENT

■ Before turning to the substantive issues Willard raises, we must review a jurisdictional issue the district court raised: whether Willard met 28 U.S.C. § 2254's "in custody" requirement. Only a person in custody pursuant to a judgment of a state court may bring a habeas corpus action under § 2254. *See* 28 U.S.C. § 2254(a); Rules Governing Section 2254 Cases, Rule 1, Advisory Committee Note. At the time Willard brought his habeas corpus action, he was serving a federal sentence imposed by the Southern District of Indiana; he had not begun to serve his state sentence. Therefore, Willard was not literally "in custody" pursuant to the judgment of a state court.

■ However, Rule 1(a)(2) of the Rules Governing Section 2254 Cases provides that those rules apply to a habeas corpus application "by a person in custody pursuant to a judgment of a ... federal court, who makes application for a determination that custody to which he may be subject in the future under a judgment of a state court will be in violation of the Constitution ...

of the United States." Willard met Rule 1(a)(2)'s requirements when he filed his habeas petition. He was in custody pursuant to a federal court's judgment and he alleged that his future Indiana custody would violate the United States Constitution. Therefore, Willard met § 2254's in custody requirement, and the district court properly entertained Willard's habeas corpus petition.

## III. PRETRIAL PUBLICITY AND THE TRIAL COURT'S HANDLING OF MEDIA COVERAGE DURING TRIAL

### A. Pretrial Publicity

As noted, Marjorie Jackson's murder generated fairly extensive publicity. Before trial, Willard moved for a change of venue, alleging that pretrial publicity made a fair trial in Marion County impossible. The trial court denied Willard's motion for change of venue, and the Indiana Supreme Court affirmed the trial court's decision. 272 Ind. at 594–95, 400 N.E.2d at 155–56.

■ Extensive pretrial publicity does not, in itself, render a trial unfair and violate a defendant's right to due process. *Dobbert v. Florida*, 432 U.S. 282, 303, 97 S.Ct. 2290, 2303, 53 L.Ed.2d 34 (1977). In rare cases where pervasive and inflammatory pretrial publicity utterly corrupts the trial atmosphere, a court may presume the pretrial publicity prejudiced the accused. *See Dobbert*, 432 U.S. at 302, 97 S.Ct. at 2302; *Murphy v. Florida*, 421 U.S. 794, 798, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975); *United States v. Garza*, 664 F.2d 135, 138 n. 1 (7th Cir.1981), *cert. denied*, 455 U.S. 993, 102 S.Ct. 1620, 71 L.Ed.2d 854 (1982). However, where pretrial publicity has not rendered the trial setting inherently prejudicial, a defendant must show pretrial publicity created actual juror prejudice against him. *Garza*, 664 F.2d at 138–39. Jurors need not be ignorant of the defendant's case; to show actual juror prejudice, the defendant must show that a juror cannot lay aside any preconceived impression or opinion of the case and decide the case solely on the evidence. *Murphy*, 421 U.S. at 800, 95 S.Ct. at 2306.

Willard has not shown that pretrial publicity rendered his trial setting inherently prejudicial. The record contains newspaper articles Willard submitted to the trial court. The record also contains a stipulation that Willard and the state entered into before the hearing on Willard's motion for change of venue. The stipulation essentially stated that Indianapolis newspapers and television stations had given Marjorie Jackson's murder extensive coverage throughout central Indiana. The stipulation also noted the general contents of some of the press coverage, and noted that the trial judge had allowed television crews to film Willard's arraignment from inside the courtroom.

■ Willard compares the publicity his case received to the publicity that, in part, led the Supreme Court to reverse the defendant's conviction in *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). Willard's comparison is unavailing. In *Sheppard*, Sam Sheppard had been accused of murdering his pregnant wife. Press coverage of the case included articles about Sheppard's failure to cooperate with investigating officers, his refusal to take a lie detector test, his married life, and his alleged extramarital affairs. The press coverage generally assumed Sheppard's guilt and urged authorities to prosecute. *Id.* at 338–42, 86 S.Ct. at 1509–11. In this case, however, the trial court found that the pretrial publicity focused mainly on Marjorie Jackson and her eccentric lifestyle. The trial court also found that the pretrial publicity in this case was not the type that would arouse hatred towards Willard. The record fairly supports these findings.[1] Neither the stipulation nor the newspaper articles show that

---

1. 28 U.S.C. § 2254(d) requires that a federal habeas court presume that a state court's written findings of fact are correct unless any of the conditions of 28 U.S.C. § 2254(d)(1)–(7) exist, or unless the findings are not fairly supported by the record. 28 U.S.C. § 2254(d)(8). None of the conditions listed in § 2254(d)(1)–(7) exist in this case. Therefore, we must presume the Indiana courts' findings of fact are correct unless not fairly supported by the record.

pretrial publicity rendered Willard's trial inherently prejudicial.

Willard also has not demonstrated that the pretrial publicity caused actual juror prejudice against him. The Indiana Supreme Court found, on the voir dire record before it, that Willard had not shown that the jurors could not decide the case solely upon the evidence. 272 Ind. at 595, 400 N.E.2d at 156. Thus, Willard did not carry his burden of proving actual juror prejudice.

We also note, as the trial judge did, that since Willard's case received extensive publicity throughout Indiana and, to some extent, the entire country, it would have been difficult to find anyplace to hold the trial where potential jurors had not heard about the case or the suspects. Also, as the trial judge noted, Willard was more likely to receive a fair trial in a metropolitan area like Indianapolis, where his case was just one story among many, than in a small town, where the case would likely be the biggest story in town. Therefore, it is unlikely that a change of venue would have rendered Willard's trial any fairer than it was, and might possibly have had the opposite result.

In sum, Willard has shown at most that his case received extensive pretrial publicity. Extensive pretrial publicity, alone, does not render a trial unfair. *Dobbert,* 432 U.S. at 303, 97 S.Ct. at 2303. The trial court did not deny Willard a fair trial by denying Willard's motion for change of venue and Willard is not entitled to habeas corpus relief on this ground.

B. *Media Activity During Trial*

The trial judge allowed Willard's trial to be videotaped and, over Willard's objection, disseminated the tapes to the media for public broadcast. The trial judge also allowed the media to take film and photographs through the courtroom windows, and allowed the media to film or photograph anywhere outside the courtroom, as

long as the photographers used "discretion and good taste." Willard alleges that the way the trial judge controlled media activity during the trial deprived Willard of a fair trial.

■ Willard's argument focuses on the trial judge's decision to videotape the trial and disseminate the tapes to the media for public broadcast. Citing *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), Willard contends that the mere presence of cameras in the courtroom inherently deprives a criminal defendant of a fair trial and violates due process. However, Willard objected only to the dissemination of tapes to the media, not to the taping itself. Given this, Willard may not complain that the cameras' mere presence denied him a fair trial.

■ In any event, Willard's reading of *Estes* is incorrect in light of the Court's subsequent decision in *Chandler v. Florida,* 449 U.S. 560, 101 S.Ct. 802, 66 L.Ed.2d 740 (1981). In *Chandler,* the Court held that *Estes* did not establish "a constitutional rule barring still photographs, radio, or television coverage in all cases...." *Chandler,* 449 U.S. at 573, 101 S.Ct. at 809. Instead, a defendant must show that television coverage of his trial actually prejudiced him. *Id.* at 575, 581, 101 S.Ct. at 810, 813. A defendant may show prejudice by showing that the television coverage compromised the jury's ability to judge him fairly. A defendant may also show prejudice by showing that the television coverage "had an adverse impact on the trial participants sufficient to constitute a denial of due process." *Id.* at 581, 101 S.Ct. at 813.

■ Like the appellants in *Chandler,* Willard has not attempted to show that videotaping his trial and disseminating the tapes to the media for public broadcast affected the jury's ability to decide his case fairly or had any adverse impact on any of the trial participants.[2] *See id.* Likewise, Willard has not attempted to specifically

**2.** For example, Willard has not disputed the Indiana Supreme Court's finding that the jurors did not know that the court was disseminating tapes for public broadcast. *See* 272 Ind. at 600,

400 N.E.2d at 158 ("the jury was sequestered and not made aware of the fruits [of the taping].").

show how any of the other media activity at his trial actually prejudiced him. The record supports the Indiana Supreme Court's finding that no "carnival" atmosphere[3] existed at Willard's trial. *See* 272 Ind. at 600, 400 N.E.2d at 158. Since Willard has not shown that media activity during his trial actually prejudiced him, and therefore denied him a fair trial, the district court correctly denied Willard habeas corpus relief on this ground.

## IV. JURY'S TOUR OF THE MARION COUNTY JAIL

After trial, Willard filed a Motion for Mistrial or in the alternative to Set Aside the Jury's Verdict, based on the fact that the jury had been given a guided tour of the Marion County Jail during the trial. The trial judge denied Willard's motion.

Allowing a sequestered jury to tour the jail in which the defendant is housed during trial presents an unusual situation, to say the least. Willard contends that this court must reverse his conviction because the jury tour "must necessarily have [had] some effect on [the jury's] ability to deliberate." (Willard Br. at 44–45).

However, due process "does not require a new trial every time [jurors] have been placed in a potentially compromising situation...." *Rushen v. Spain*, 464 U.S. 114, 118, 104 S.Ct. 453, 455, 78 L.Ed.2d 267 (1983) (per curiam); *see also Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982). Due process requires only that the trial court hold a hearing to determine if the potentially compromising situation has affected the jury's ability to deliberate fairly and has thus actually prejudiced the defendant. *See Rushen*, 464 U.S. at 119–20, 104 S.Ct. at 456; *Smith*, 455 U.S. at 215, 102 S.Ct. at 944. Generally, a post-trial hearing is adequate to determine whether the defendant has been prejudiced. *Rushen*, 464 U.S. at 120, 104 S.Ct. at 456.

In the present case, the trial judge held a post-trial hearing on Willard's Motion for Mistrial or in the Alternative to Set Aside the Jury's Verdict. The trial judge gave Willard an opportunity to call witnesses; Willard declined that opportunity. The only witness to testify at the hearing, Deputy Sheriff Summers, testified that the jury received the same tour as any other group would receive. The tour lasted approximately thirty minutes. The jurors were not allowed to view any of the cell blocks. Some jurors did see three inmates in a classroom but the only actual juror contact with an inmate occurred when a juror complimented an inmate in the classroom on a drawing the inmate had made. On cross-examination by Willard's counsel, Deputy Summers testified that the jury had only seen parts of the jail's first and second floors; Willard had been housed on the fourth floor.

As the Indiana Supreme Court found, the record contains no evidence of anything occuring on the tour that might have adversely influenced the jury. 272 Ind. at 601, 400 N.E.2d at 155. The jail tour was innocuous and, thus, taken alone or together with the pretrial publicity and media activity during trial, did not deny Willard a fair trial. The jail tour is not grounds for habeas corpus relief.

## V. FOURTH AMENDMENT CLAIM

FBI agents apprehended Willard and Marjorie Pollitt in Arizona, obtained a warrant, and searched the motorhome in which Willard and Pollitt were staying. The search turned up evidence the state subsequently used against Willard at trial. Willard filed a motion to quash the search warrant and suppress the evidence. After a hearing, the trial court denied the motions. The Indiana Supreme Court affirmed the trial court. 272 Ind. at 592–94, 400 N.E.2d at 154–55.

Willard attempted to raise the same Fourth Amendment claim in his federal habeas corpus petition that he raised

---

**3.** The *Chandler* Court used the similar terms "Roman circus," and "Yankee Stadium" to describe the trial in *Estes*. *Chandler*, 449 U.S. at 582, 101 S.Ct. at 813.

in the Indiana courts.[4] The district court refused to consider Willard's Fourth Amendment claim on the merits, ruling that the Indiana courts offered Willard a full and fair opportunity to litigate that claim. A federal court may not grant a state prisoner habeas corpus relief on the ground that the trial court admitted evidence obtained in violation of the Fourth Amendment, where the state has provided an opportunity for full and fair litigation of the Fourth Amendment claim. *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); *see also Cardwell v. Taylor*, 461 U.S. 571, 572, 103 S.Ct. 2015, 2016, 76 L.Ed.2d 333 (1983) (per curiam); *United States ex rel. Patton v. Thieret*, 791 F.2d 543, 547 (7th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 284, 93 L.Ed.2d 259 (1986). Willard's Fourth Amendment claim falls squarely within *Stone's* holding.

▇▇▇ The district court correctly decided that the Indiana courts afforded Willard a full and fair opportunity to litigate his Fourth Amendment claim. The trial court held a hearing on Willard's motion to quash the search warrant and suppress the evidence obtained in searching his motor home, and denied Willard's motion. The Indiana Supreme Court affirmed the trial court's decision on the merits. 272 Ind. at 592–94, 400 N.E.2d at 154–55. Willard raised the same issues in the Indiana courts that he raises now, and the Indiana courts considered Willard's claim and rejected it. Therefore, *Stone* barred the district court from granting Willard federal habeas corpus relief on his Fourth Amendment claim.

## VI. OTHER ISSUES

### A. *Motion to Sever Crimes*

Willard was indicted on eight counts, all arising from the shooting death of Marjorie Jackson, the theft of money from her home, and burglaries and arson of her home. Willard filed a motion in the trial court to sever the crimes. The trial court denied Willard's motion. The Indiana Su-

preme Court affirmed. 272 Ind. at 596, 400 N.E.2d at 156–57.

▇▇▇ Willard asserts that the state joined the crimes charged "solely on the ground that they were of the same or similar character." *See* Ind.Code Ann. § 35–34–1–11(a) (West 1986). Therefore, Willard asserts he was entitled to severance as of right. *See id.* This contention raises only the question whether the trial court and Indiana Supreme Court properly applied a state statute. A federal court may not grant a state prisoner habeas corpus relief for mere violations of state law. 28 U.S.C. § 2254(a) (federal court may grant habeas corpus relief to state prisoner only on the ground that he is "in custody in violation of the Constitution, laws, or treaties of the United States."); *Engle v. Isaac*, 456 U.S. 107, 119–21, 102 S.Ct. 1558, 1567–68, 71 L.Ed.2d 783 (1982); *United States ex rel. Hoover v. Franzen*, 669 F.2d 433, 436–37 (7th Cir.1982). Willard is not entitled to habeas corpus relief for this alleged violation of state law.

▇▇▇ Willard also contends that the trial court's failure to sever his crimes rendered his trial fundamentally unfair, and denied him due process. Severing crimes is within the trial court's discretion. Trying more than one crime at the same trial is not error unless trying the crimes together renders the defendant's trial unfair and violates due process. *Tribbitt v. Wainwright*, 540 F.2d 840, 841 (5th Cir.1976), *cert. denied*, 430 U.S. 910, 97 S.Ct. 1184, 51 L.Ed.2d 587 (1977). To show his trial was fundamentally unfair, Willard must demonstrate, at a minimum, "prejudice sufficient to warrant relief under Fed.R.Cr.P. 14 or its state counterpart...." *Alvarez v. Wainwright*, 607 F.2d 683, 685 (5th Cir. 1979); *see United States v. Peters*, 791 F.2d 1270, 1287 (7th Cir.) (in a federal criminal trial, the essential issue in determining whether a trial court abused its discretion by denying a motion to sever crimes is whether the trial court's action caused de-

---

4. Willard asserted that: 1) the search warrant did not accurately describe the motorhome; 2) the search warrant was not supported by proba-
ble cause; and 3) the search warrant was vague and general as to the items to be searched for.

fendant to suffer substantial actual prejudice), *cert. denied sub nom., Odoner v. United States,* — U.S. ——, 107 U.S. 168, 93 L.Ed.2d 106 (1986).

Willard has not identified any specific instances of prejudice resulting from the trial court's failure to sever the crimes. Willard asks this court to presume prejudice because the number of witnesses and exhibits at trial (51 witnesses and 150 exhibits) made it impossible for the jury to distinguish the evidence and intelligently apply the law. Willard does not explain why the number of witnesses and exhibits at trial prevented the jury from properly performing its duties. The Indiana Supreme Court found that trying all the crimes at the same trial would not cause confusion or hinder a fair determination of Willard's guilt. 272 Ind. at 596, 400 N.E.2d at 156. As the district court noted, the number of charges and amount of evidence in this case do not raise an inference of prejudice. Furthermore, the crimes were all part of an ongoing scheme so that evidence of any one crime was evidence of the entire criminal transaction. *Id.* Therefore, we doubt a severance would have benefitted Willard anyway. The district court properly denied habeas corpus relief on this ground.

### B. *Sufficiency of the Evidence*

Willard contends there was insufficient evidence to convict him of Counts II (burglary), IV (burglary), and VIII (arson). A federal court may grant habeas corpus relief on an insufficient evidence claim only if, after viewing the evidence in the light most favorable to the prosecution, the court finds that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The federal habeas court must assume that the jury resolved all evidentiary conflicts and found all reasonable inferences in the state's favor. *See id.* at 326, 99 S.Ct. at 2792; *United States ex rel. Foster v. DeRobertis,* 741 F.2d 1007, 1012 (7th Cir.1984), *cert. denied,*

469 U.S. 1193, 105 S.Ct. 972, 83 L.Ed.2d 975 (1985).

The record reveals that sufficient evidence exists to convince a rational trier of fact that Willard was guilty of the two burglaries and arson. Willard is not entitled to habeas corpus relief on the ground of insufficient evidence.

### C. *Co-defendant's Aquittal at Separate Trial on the Same Charges that Willard was Convicted Of*

Finally, Willard contends his convictions for murder and armed robbery cannot stand because he was convicted as an accessory and the alleged principal, Manuel Robinson, was acquitted of those charges in a separate trial. Willard has couched his argument solely in state law terms and has not asserted any federal constitutional deficiency. A federal court may only grant habeas corpus relief to state prisoners "in custody in violation of the Constitution, laws, or treaties of the United States." 28 U.S.C. § 2254(a) (1982). The district court properly denied Willard federal habeas corpus relief on this ground.

For the reasons expressed above, the district court's denial of Willard's petition for habeas corpus is

AFFIRMED.