In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 21-1405, 21-1468, & 21-1991

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

YAHTZEE HARRIS, ANTONIO WALTON, and CHARLES GOULD,

*Defendants-Appellants.*

_____

Appeals from the United States District Court for the
Northern District of Indiana, Hammond Division.
Nos. 2:17CR47-002, -001, -012 — **Philip P. Simon**, *Judge*.

_____

ARGUED FEBRUARY 8, 2022 — DECIDED OCTOBER 14, 2022

_____

Before SYKES, *Chief Judge*, and SCUDDER and JACKSON-AKIWUMI, *Circuit Judges*.

JACKSON-AKIWUMI, *Circuit Judge*. This case is about a large drug conspiracy in Gary, Indiana. A grand jury indicted more than 20 people associated with the conspiracy. Three of them are now before us on appeal. Charles Gould and Antonio Walton contend that the district court erred by holding a trial during the COVID-19 pandemic. Gould further challenges the sufficiency of the evidence at trial, while Walton challenges

his sentence. Yahtzee Harris, who pled guilty and did not participate in the trial, contends that his written judgment contradicts the district judge's oral pronouncement of his sentence.

We affirm in all respects the judgments against each defendant. We take this opportunity, however, to clarify the effect of Harris's appeal waiver. The government contends that Harris's appeal should be dismissed because he waived his right to challenge his sentence as part of a plea agreement. But an argument that a written judgment conflicts with a sentencing judge's oral pronouncement is not a challenge to the sentence—rather, it is a request for imposition of the actual sentence the judge intended. *United States v. Tancil*, 817 F. App'x 234 (7th Cir. 2020). Thus, an appeal waiver will generally not bar this type of claim.

**I**

The drug conspiracy in this case involved three drug houses in Gary, Indiana. At the center of the conspiracy was Walton. He supplied crack cocaine to three people who ran drug houses: Ben Hickman, Keana Porter, and Harris. Gould dealt drugs out of a different drug house, run by Keana Porter, with whom he was in a romantic relationship.

Many of the conspirators pled guilty to drug charges, including Harris and the other two defendants who ran the drug houses. Walton, Gould, and a third defendant named Telisha French went to trial on charges that they conspired to distribute both powder and crack cocaine in violation of 21 U.S.C. §§ 841 and 846.

After a six-day trial, a jury found Walton and Gould guilty of conspiring to distribute more than 280 grams of crack

cocaine. The jury did not find them culpable, however, for any quantity of powder cocaine. The jury acquitted French of all charges.

The district court sentenced Walton to 360 months' imprisonment, Gould to 168 months' imprisonment, and Harris to 228 months' imprisonment. All three defendants received additional terms of five years' supervised release. All three appealed, and we consolidated the appeals.

## II

Gould's, Walton's, and Harris's appeals raise four distinct issues. We address each issue in turn.

### A. The district court did not plainly err by holding a trial during the pandemic

Gould and Walton contend that their convictions should be vacated because the district court violated their rights to due process by holding a trial in the Northern District of Indiana's Hammond courthouse during a pandemic. The district court set trial for March 9, 2020, which coincided with the first major wave of the COVID-19 infections in Indiana. Indiana declared a public health emergency three days before jury selection, and the World Health Organization declared a pandemic on the same day that the jury heard opening arguments. Two days later, the President of the United States declared a national emergency, and the Southern District of Indiana (the only other judicial district in Indiana) suspended all trials.[1]

---

[1] *See* S.D. Ind. General Order (Mar. 13, 2020), https://www.insd.uscourts.gov/sites/insd/files/general-

Outside the presence of the jury, the court acknowledged
the potential effect of the pandemic on the trial and indicated
its intention to keep the trial "moving forward." The jury con-
tinued to hear evidence through the following week, while
Indiana shut down bars and restaurants. As the pandemic
progressed, the court emphasized to the parties (again, out-
side the presence of the jury) the need to wrap things up and
"get this thing through the system given what's going on in
the world right now." The court also cautioned, however, that
the parties should not rush. The trial ended the next day,
March 17, which is also when the Northern District of Indiana
postponed all future trials.[2] The day after that, all courthouses
in the Northern District were closed to the public.[3]

Because defendants did not seek a mistrial or adjournment
before the district court, we review the court's decision to
hold the trial only for plain error. *See United States v. Tanner*,
628 F.3d 890, 898 (7th Cir. 2010). To succeed under plain-error
review, the defendants must show that "(1) the error com-
plained of actually occurred; (2) the error was clear or obvi-
ous; (3) the error affected [their] substantial rights (*i.e.,* [they]
probably would not have been convicted absent the error);
and (4) the error seriously impugned the judicial proceeding's
fairness, integrity, or public reputation." *Id.*

---

ordes/Court%20General%20Order%20RE%20COVID-19%20-%203-13-20-
Signed.pdf.

[2] *See* N.D. Ind. General Order No. 2020-05 (Mar. 17, 2020),
https://www.innd.uscourts.gov/sites/innd/files/2020-05.pdf.

[3] *See* N.D. Ind. General Order No. 2020-06 (Mar. 18, 2020),
https://www.innb.uscourts.gov/sites/innb/files/2020-06.pdf.

The Due Process Clause gives criminal defendants the right to be tried before an impartial jury—that is, one made up of jurors who can "lay aside [their] impression[s] or opinion[s] and render a verdict based on the evidence presented in court." *United States v. McClinton*, 135 F.3d 1178, 1186 (7th Cir. 1998) (quoting *Murphy v. Florida*, 421 U.S. 794, 800 (1975)). This right is violated when a jury is not capable or willing to decide the case solely on the trial evidence. *Smith v. Phillips*, 455 U.S. 209, 217 (1982). And to protect this right, trial judges should be "ever watchful" for prejudicial occurrences that could interfere with jurors' ability to perform this duty. *Id.*

Due process does not require, however, a new trial every time a juror has been placed in a potentially compromising situation. *Id.*; *United States v. Moore*, 641 F.3d 812, 829 (7th Cir. 2011). For example, in *Chandler v. Florida*, 449 U.S. 560 (1981), the defendants challenged the trial court's decision to televise their trial, arguing that the sensational media atmosphere unfairly influenced the jurors. But because the defendants did "not attempt[] to show with any specificity that the presence of cameras impaired the ability of the jurors to decide the case on only the evidence before them," the Court refused to set aside his conviction. *Id.* at 581. *See also Willard v. Pearson*, 823 F.2d 1141, 1146–48 (7th Cir. 1987) (broadcast of a trial and extensive pretrial media coverage about murder victim's eccentric lifestyle did not violate due process because defendant did not establish that media coverage influenced the jury).

Defendants' arguments here suffer from similar shortcomings. Gould and Walton rely on the timing of various events as evidence that the pandemic presumptively interfered with the jury's deliberations: The district court allowed their trial to move forward even after the state's other federal judicial

district (the Southern District of Indiana) suspended jury tri-
als, and the Northern District of Indiana issued a general or-
der suspending proceedings in all cases *except* theirs on the
day of closing arguments. Defendants insist that halting pro-
ceedings was the only prudent decision in light of the emerg-
ing pandemic.

The record suggests, however, that the jurors carefully
considered the evidence before rendering a verdict. To be
sure, the pandemic would have been on the jurors' minds in
the waning days of the trial. But we see no evidence that they
rushed a verdict to go home early. The jury returned a mixed
verdict—acquitting Walton and Gould on some counts and
completely acquitting their codefendant French. And the jury
did not deliver that verdict until around 7:00 p.m., after delib-
erating for six hours and asking the court for clarification
about the court's instructions on how to calculate drug quan-
tity. Because nothing at the time suggested that the pandemic
stopped the jury from deciding the case "solely on the evi-
dence before it," *McClinton*, 135 F.3d at 1186, and nothing sug-
gests as much now, the district court did not plainly err when
it decided to finish the trial.

The court's decision to finish the trial was also reasonable
under the circumstances. Other courts in this circuit, like the
Northern District of Illinois, likewise hesitated to stop crimi-
nal proceedings at the outbreak of the pandemic because of
speedy trial concerns.[4] Such concerns were especially salient
in this case because Gould and Walton had already been in

---

[4] *See* N.D. Ill. General Order No. 20-0012 (March 12, 2020),
https://www.ilnd.uscourts.gov/_assets/_news/Coronavirus%2020-0012fi-
nal.pdf.

pretrial detention for two years and would have been entitled to release had they won at trial. French—who was acquitted— was in home detention. Indeed, without an objection from defendants, the court could have reasonably believed that defendants *wanted* the trial to finish so that they would not languish in pretrial detention for the remainder of an indefinite pandemic.

Although some district courts shut down earlier in March 2020, the Northern District of Indiana was not an outlier within this circuit. For instance, the Northern District of Illinois did not suspend criminal proceedings until March 16, only one day before the Northern District of Indiana did, and the Western District of Wisconsin did not suspend trials until after Gould's and Walton's convictions.[5] As various courts scrambled to respond to the pandemic, they balanced in different ways the need to prevent the spread of COVID-19 against the need for continued and efficient adjudication of criminal trials. The court here reasonably struck that balance when it decided that it was best to finish a trial that was nearly complete.

Defendants alternatively argue that the district court deprived them of their constitutional right to present a complete defense. They point to the district court's comments on the second-to-last day of trial that "we have to get this thing through the system given what's going on in the world right now," implying that the court pressured them into resting

---

[5] *See* N.D. Ill. Amended General Order 20-0012 (March 16, 2020), https://www.ilnd.uscourts.gov/_assets/_news/Amended%20General%20Order%2020-0012.pdf; W.D. Wis. Admin. Order 362 (March 18, 2020), https://www.wiwd.uscourts.gov/sites/default/files/Admin_Order_362.pdf.

early. But they do not point to any witnesses they wanted to call or explain what additional evidence they would have presented if given extra time. And although the court encouraged efficiency, it also admonished the parties to finish the trial "[w]ithout rushing, just try to be efficient." We are not persuaded that this comment had any prejudicial effect.

## B. The record contains sufficient evidence to support Charles Gould's conspiracy conviction

Charles Gould challenges the jury's verdict convicting him of conspiracy to distribute crack cocaine. The government's case against him focused on the drug operation in Porter's house. Gould conceded to buying drugs from Porter, but he argued at trial that he was merely a buyer of drugs for his own personal business and not a co-conspirator.

### 1. Background

The government introduced evidence that Porter's house was used as a stash house for the conspiracy. She would receive crack cocaine from Walton and repackage it in individual baggies for resale. She would then hand bundles of baggies through her bedroom window to individual dealers, including Gould, who would sell them next door in an abandoned "trap house."

Porter testified that she did not make the dealers pay for the drugs up front. Dealers would take the drugs, sell them to end users at the trap house, and then bring the proceeds back to Porter. Porter kept track of the sales in a ledger, but she explained that at least some dealers, including Gould, would also sometimes buy drugs directly from Walton. She further testified that she would ultimately send any money she gathered back to Walton, and that Gould and another dealer

named Courtney Crouch acted as couriers, ferrying drugs and cash between Walton and her. Finally, she testified that Gould left a gun for her to keep in her bedroom.

When asked about the extent of Gould's participation, Porter testified that Gould would sell drugs and bring her the proceeds "every day." But on cross examination, the defense pointed out that Gould was mentioned only a handful of times in Porter's ledger. Porter responded that Gould "maybe" showed up more often in her older ledgers, but she no longer had those. On redirect, she stated that Gould, and several other dealers, were underrepresented in the ledger because they sometimes worked directly with Walton.

The government also introduced text messages that implicated Gould as a member of the conspiracy. On at least two occasions, Gould texted Porter to ask her to charge walkie-talkies used by a conspirator who patrolled the area and acted as security. And on another occasion, he texted Porter to warn her about police in the area. Gould also texted the other courier, Crouch, to ask for help searching another dealer. Crouch testified at trial that he and Gould waited for the dealer and then searched the dealer's pockets to see if he was holding any of Walton's money.

During closing arguments, Gould did not dispute that he bought wholesale quantities of crack cocaine from Porter. But he argued that he did not distribute or sell the drugs for Walton or Porter as part of their conspiracy. He emphasized another text message that Walton had sent Porter telling her not to mix Gould's money with the money from other dealers. Porter could not explain why Gould's money had been kept separate, and Gould argued that Walton would have had no reason to keep the money separate if Gould was part of the

same conspiracy. The jury rejected this argument and convicted Gould of conspiracy to distribute crack cocaine.

Gould filed a postjudgment motion for acquittal under Rule 29(c) of the Federal Rules of Criminal Procedure. He reiterated the argument he had made to the jury that he should be acquitted of any conspiracy charges because the government had failed to establish that he had more than a buyer-seller relationship with Porter. The district court denied the motion, explaining that the record contained evidence that "Gould wore multiple hats in this conspiracy, including: dealer, courier, lookout, and enforcer." A rational jury could thus find, the court concluded, that Gould had more than a buyer-seller relationship with the other conspirators.

### 2. *Standard of Review*

Gould contends that the district court should have granted his motion for acquittal. We will reverse a district court's denial of a Rule 29 motion for judgment of acquittal only if, viewing all evidence in a light most favorable to the government, we conclude that no rational trier of fact could have found the defendant guilty. *See United States v. Jackson*, 5 F.4th 676, 682 (7th Cir. 2021) (collecting cases). We defer only to the jury verdict, however, and do not defer to the district judge's ruling. *United States v. Garcia*, 919 F.3d 489, 496 (7th Cir. 2019).

When reviewing the record and verdict, we afford significant deference to the jury's credibility determinations. "A determination that testimony is incredible is reserved for extreme situations where, for example, 'it would have been physically impossible for the witness to observe what he described, or it was impossible under the laws of nature for those events to have occurred at all.'" *United States v. Brown*,

973 F.3d 667, 686 (7th Cir. 2020) (quoting *United States v. Conley*, 875 F.3d 391, 400 (7th Cir. 2017)).

### 3. *Analysis*

Gould does not contest that he bought wholesale crack cocaine from Porter, but he argues that the government did not present evidence from which a rational jury could find beyond a reasonable doubt that he belonged to a conspiracy with Porter, Walton, or the other defendants. As he points out, the purchase of wholesale drugs is not enough on its own to convict a defendant of conspiracy to distribute the drugs. *See United States v. Pulgar*, 789 F.3d 807, 812–13 (7th Cir. 2015). The government must also prove an agreement for the defendant to further distribute the drugs—or otherwise aid the conspiracy—that is "*distinct from* evidence of the agreement to complete the underlying drug deals." *Id*. at 812.

Gould argues that we should use what he calls the "*Johnson* factors" to determine whether he was a member of the conspiracy or in a buyer-seller relationship.[6] *See United States v. Johnson*, 592 F.3d 749, 756 (7th Cir. 2010). But we have repeatedly emphasized that "there is no rigid list or formula to prove a conspiracy in the absence of an express agreement." *Pulgar*, 789 F.3d at 813 (citing *United States v. Brown*, 726 F.3d 993, 1002 (7th Cir. 2013)). Some cases, like *Johnson*, may list

---

[6] In *Johnson*, we said that participation in a conspiracy could be demonstrated by, among other things: "[1] sales on credit or consignment, [2] an agreement to look for other customers, [3] a payment of commission on sales, [4] an indication that one party advised the other on the conduct of the other's business, or [5] an agreement to warn of future threats to each other's business stemming from competitors or law-enforcement authorities." *Johnson*, 592 F.3d at 755–56 (citation omitted).

"example considerations" that superficially seem like a check-list of factors. *Id.* Ultimately, however, we look at the totality of the circumstances and make a holistic assessment of whether the jury reached a reasonable verdict. *Id.*

The nonexhaustive factual examples listed in *Johnson* are helpful considerations when assessing evidence that Gould distributed drugs on behalf of the conspiracy, but distribution is not the only way that someone can contribute to a larger drug operation. A defendant can also assist a conspiracy by, for example, acting as a courier, *United States v. Vizcarra-Millan*, 15 F.4th 473, 509 (7th Cir. 2021), helping the conspiracy avoid trouble from competitors or law enforcement, *Johnson*, 592 F.3d at 756, or by taking other actions to further the conspiracy, *see, e.g.*, *United States v. Hunte*, 196 F.3d 687, 691 (7th Cir. 1999) (defendant made hotel reservations for drug distributors, drove for them, and lied to police about their activities). Here, the government took a multi-pronged approach: it sought to establish that Gould not only distributed drugs on behalf of the conspiracy, but also participated in other ways such as transporting drugs and helping with security.

Most of the government's evidence for Gould's participation in the conspiracy comes from Porter's testimony. Gould asks us to disregard this testimony as unreliable because Porter had a deal with the government, previously lied to the police, and gave testimony that he says contradicts her earlier statements to a detective. But Gould already made these arguments at trial, and the jury—not this court—gets to decide whether Porter is untrustworthy, or whether her motives made her testimony not credible. *See United States v. Stevenson*, 680 F.3d 854, 857 (7th Cir. 2012).

Crediting Porter's testimony, and looking at the totality of the circumstances, we agree with the government that the trial record contains sufficient evidence for a rational jury to find beyond a reasonable doubt that Gould was in a conspiracy with Walton and Porter.

For starters, the government put on evidence that Gould distributed drugs for the conspiracy rather than for his own independent enterprise. Most significantly, Porter testified that she fronted drugs to Gould every day, after which he would sell them at the same trap house used by the conspiracy's other dealers and then return the proceeds to her or Walton. Repeated, fronted transactions can be compelling evidence of a conspiracy to distribute because it demonstrates that the defendant has "knowingly thrown his lot in" with the supplier and has a "keen interest in his co-conspirators' success." *United States v. Hopper*, 934 F.3d 740, 755 (7th Cir. 2019) (quotation omitted).

Gould tries to poke holes in Porter's testimony by pointing out that Porter's ledger documents only a handful of sales to him, and by highlighting Walton's text message directing Porter to keep Gould's money separate. But Porter explained that the ledger did not include all of Gould's transactions because Gould would sometimes deal with Walton directly. Even if the jury doubted Porter's testimony that Gould was at the trap house "every day," it could still credit Porter's explanation that the ledger was incomplete and find that Gould was there frequently. Likewise, the jury could have inferred that Gould's money was kept separate for various reasons. Maybe Gould was the courier for the money that day and would deliver his share himself, or maybe Walton owed Gould money for other services. The jury was not required to make the

inferences that Gould wanted: "It is the jury's job, and not ours, to gauge the credibility of the witnesses and decide what inferences to draw from the evidence." *Stevenson*, 680 F.3d at 857 (citation omitted).

Even if Gould did not distribute drugs for the conspiracy, the government presented evidence that he participated in the conspiracy in other ways. Porter testified that Gould was one of several couriers who would transport crack cocaine and money between Walton and Porter, and "courier work alone may be enough to rule out an alternative buyer-seller hypothesis." *Vizcarra-Millan*, 15 F.4th at 509 (citing *United States v. Salinas*, 763 F.3d 869, 877–78 (7th Cir. 2014)). Other evidence supported an inference that Gould sometimes acted as an enforcer or helped with security: Crouch testified that Gould asked him to help search a dealer's pockets, because that dealer was suspected of taking money from Walton; text messages between Gould and Porter showed that he reported when police were driving through the area; and on at least two occasions, Gould asked Porter to charge walkie-talkies used by the trap house's security guard.

Gould attempts to minimize these actions as isolated incidents in which he acted in his own self-interest. A drug buyer who tries to protect himself by warning his supplier about incoming police or other dangers is not necessarily in a conspiracy with the buyer. *See, e.g., Johnson*, 592 F.3d at 757 (not evidence of conspiracy when buyer called seller to postpone drug deal because police were nearby). But shaking down other dealers and proactively aiding in lookout activities for other drug deals by helping to prepare walkie-talkies are not the same thing as trying to get the police off one's own back. A jury could reasonably infer that Gould took these actions to

protect the conspiracy, not himself. Taken altogether, Gould's actions were sufficient for a reasonable jury to find a conspiracy beyond a reasonable doubt.

## C. The district court did not reversibly err when sentencing Antonio Walton

Antonio Walton challenges the district court's calculation of the Sentencing Guidelines and what he says is a substantively unreasonable sentence. At Walton's sentencing hearing, the district court calculated a guidelines range of 360 months to life imprisonment, based in part on its conclusion that Walton's prior state convictions made him a career offender under U.S.S.G. § 4B1.1. The court then imposed a within-guidelines sentence of 360 months.

Walton had asked the court to impose the statutory minimum sentence of 10 years' imprisonment. He disputed the government's characterization that he controlled the operations at all three drug houses, arguing that two of the drug houses relied on him merely as a supplier. Walton further argued that even the bottom of his guidelines range was unreasonably high because, at 44 years old, a 30-year sentence would be an "effective life sentence." He compared his guidelines range against the average sentence given to other members of the conspiracy, which was about 52 months. As mitigation evidence, Walton called his wife who testified about how Walton had helped her recover from a previous abusive relationship and the active role he played in their family.

The court, however, rejected these arguments. It acknowledged that any guidelines sentence would be lengthy but thoroughly explained why the sentencing factors under 18 U.S.C. § 3553(a) justified the length. Most significantly, the

court focused on what it found to be the egregious nature and circumstances of Walton's offense: Walton was "at the top of the pyramid," supplying a number of other people, including Harris and Hickman who each had their own network of people underneath them; he negatively affected the community by distributing an "extremely addictive substance" and bringing guns and other crime to his neighborhood; he "substantially aggravate[d] the offense" by enlisting family members, including his ailing mother; and he took advantage of drug addicts who were willing to work for drugs, while he himself had no history of addiction and was motivated solely by profit. The court further highlighted how multiple prior prison sentences had not deterred Walton from criminal conduct. And in contrast to most defendants the court had sentenced in this and other cases, the court found that Walton's childhood had been relatively stable without any characteristics that would mitigate against a lengthy sentence.

In response to Walton's argument about his codefendants' sentences, the court explained that it tried to approach multi-defendant cases in terms of relative culpability. Although many defendants in this case had received light sentences, the court found that they played relatively minor roles or were involved only for a short period of time while addicted to drugs. Accordingly, the average sentence of conspirators in this case was not a useful measuring stick. Walton needed to be sentenced, the court reasoned, relative to his place in the conspiracy's hierarchy.

On appeal, Walton first argues that the district court erred when it concluded that his prior Indiana convictions qualified as "controlled substance offenses," thus subjecting him to the career-offender provision of U.S.S.G. § 4B1.1. But he concedes

that *United States v. Ruth*, 966 F.3d 642, 654 (7th Cir. 2020), applies to his claim. Under *Ruth*, the district court properly applied the career offender provision and calculated a guidelines range of 360 months to life imprisonment.

Thus, the bulk of Walton's challenge is to the reasonableness of his sentence, but here too his argument is unavailing. We evaluate a sentence's reasonableness only for abuse of discretion, recognizing that a within-guidelines sentence like Walton's is presumptively reasonable. *See United States v. Castro-Aguirre*, 983 F.3d 927, 943 (7th Cir. 2020). And the district court here did not merely rubber stamp a sentence within the guidelines. The court carefully considered the applicable factors under 18 U.S.C. § 3553(a) and explained why the nature of the offense, Walton's criminal history, his relative culpability compared to other defendants, and the general lack of mitigating factors all warranted a lengthy sentence.

Walton nonetheless contends that the district court created an unreasonable disparity when it sentenced him for a longer prison term than any of his codefendants. He compares himself to Harris and Hickman, two defendants who he says also ran their own drug operations but received much lighter sentences. Walton points out that Hickman had the same career-offender guidelines range as him, but the court called the range "absurd" as applied to Hickman while nonetheless applying the same "absurd" sentence to Walton. Walton maintains that, like Hickman, he too was entitled to a downward departure.

Walton's disparity argument fails because only "*unwarranted* sentence disparities" are impermissible. *United States v. Matthews*, 701 F.3d 1199, 1204 (7th Cir. 2012) (citing 18 U.S.C.

§ 3553(a)(6)). And whether Harris or Hickman serve as reasonable comparators to Walton is, at best, debatable. Unlike Walton, Hickman and Harris each took plea deals—Hickman even testified at trial. Further, although both Harris and Hickman ran branches of the drug conspiracy, the court reasonably concluded that Walton deserved a higher sentence as the person at the "top of the pyramid" who supplied defendants like Harris and Hickman.

Hickman may have been subject to the same guidelines range as Walton, but the district court gave ample explanation for why a 360-month sentence was "absurd" for Hickman and not for Walton. Although both defendants had lengthy, revolving-door style criminal histories, the court found that Hickman's mental disabilities contributed to his criminal history. The court also gave "a lot of consideration" to Hickman's cooperation because Hickman potentially endangered himself by testifying against dangerous individuals. And whereas Hickman presented mitigating factors that justified a downward departure, the court noted a surprising *lack* of mitigating factors in Walton's case. The court further found "substantially aggravat[ing]" Walton's practice of enlisting family members and contrasted Walton's profit-driven motives against the people he recruited, many of whom involved themselves in the conspiracy only to fuel their own drug addictions. In sum, the court reasonably explained why Walton's culpability relative to his codefendants warranted a higher sentence.

Walton's remaining arguments on appeal all boil down to policy disagreements with the Sentencing Guidelines, none of which he raised before the district court. He says that the district court should have considered the disparity between the

guidelines for crack and powder cocaine, and that the guidelines exaggerated the seriousness of his nonviolent criminal history. But even if he had raised these arguments below, a district court's failure to sustain this type of policy objection to the guidelines would not be grounds for reversal. Although courts have discretion to depart from the guidelines because of policy disagreements, *United States v. Law*, 990 F.3d 1058, 1066 (7th Cir. 2021), they are not required to exercise that discretion. *United States v. Rosales*, 813 F.3d 634, 637–38 (7th Cir. 2016). "As a general matter, it is not unreasonable for a judge to agree with the sentencing policy established by Congress and the Sentencing Commission." *Matthews*, 701 F.3d at 1204 (citation omitted).

### D. Yahtzee Harris did not waive his appellate argument, but he fails to identify an impermissible inconsistency between the oral sentence and written judgment

The final defendant, Yahtzee Harris, challenges what he says is an inconsistency between the district court's oral pronouncement of his sentence and its written judgment. Pursuant to a plea agreement, Harris pled guilty to conspiracy to distribute 280 grams or more of crack cocaine, *see* 21 U.S.C. § 846, and possession of a firearm in furtherance of a drug-trafficking offense, *see* 18 U.S.C. § 924. As part of this agreement, Harris also waived his right to appeal or contest his conviction, sentence, or "the manner in which [his] conviction or [his] sentence was determined or imposed," except on grounds of ineffective assistance of counsel.

During Harris's sentencing hearing, the district court announced a sentence of 228 months' imprisonment, after which Harris would be "placed on two years of supervision." The probation officer then told the court that Harris's drug

conviction carried a statutory minimum of five years' supervised release. The district judge explained that he had originally imposed only two years' supervision because "I hate lengthy terms of supervision because I think they're counterproductive." But in light of the probation officer's clarification, the judge said that he would "amend the judgment that I just announced to five years." He further explained to Harris that if Harris did "a good job in the first year" of supervision, Harris should "petition the Court and I will cut you loose from supervision because, again, I don't—no offense to probation. I think these extended terms of supervision actually end up being counterproductive to people."

The court issued its written judgment two days later. The judgment states that "[u]pon release from imprisonment, the defendant shall be on supervised release for a term of 5 years on each count, terms to be served concurrently." Harris contends that the written judgment is inconsistent with the district court's oral pronouncement because, in his view, the court orally announced an intention to impose five years' supervision for only the drug count. He asks us to order the district court to amend the written judgment so that his term of supervision for the gun charge is only two years, consistent with his understanding.

The government contends that both Harris's appeal waiver and the concurrent sentence doctrine bar his appeal. But for the reasons explained below, we resolve Harris's appeal on the merits rather than on procedural grounds.

### 1. *Harris's appeal waiver does not apply to this appeal*

The government argues that Harris's appeal should be dismissed because he waived his right to appeal his sentence

or the "manner in which [it] was imposed." We review the enforceability of an appeal waiver de novo. *United States v. Johnson*, 934 F.3d 716, 719 (7th Cir. 2019).

We have not yet addressed in a precedential opinion whether an appeal waiver like Harris's applies to a claim that a written judgment does not accurately reflect the sentencing court's oral pronouncement. But in a recent nonprecedential decision, we concluded that appeal waivers do not apply to such claims because defendants like Harris are not challenging their sentences—they seek the imposition of what they say is their actual sentences. *United States v. Tancil*, 817 F. App'x 234 (7th Cir. 2020).

We agree with Harris that *Tancil*'s reasoning is sound. Like this case, *Tancil* involved a defendant who claimed that the written judgement did not match the sentencing judge's unambiguous oral pronouncement of his sentence. The judge had emphasized that he wanted to give the defendant credit for time served during the five-plus years the defendant spent in custody between his plea and the sentencing hearing. But the written judgment was ambiguous about how the defendant's sentence should be calculated, and the Bureau of Prisons did not give the defendant the credit that the judge had intended. The defendant had signed an appeal waiver substantively identical to Harris's waiver, but we concluded that his appeal did not fall under the waiver because the defendant was "not appealing the components of his sentence or the manner in which his sentence was determined or imposed. Rather, he merely seeks the imposition of his actual sentence." *Id.* at 236.

The *Tancil* court's conclusion naturally flowed from the rule that a sentencing judge's unambiguous oral

pronouncement—not the written judgment—is the defend-
ant's "actual sentence." *Id.* The Due Process and Confronta-
tion Clauses require a defendant's presence at the imposition
of sentencing. *Id.* (citing *United States v. Agostino*, 132 F.3d
1183, 1200 (7th Cir. 1997), and *United States v. Medina-Mora*,
796 F.3d 698, 700 (7th Cir. 2015)). So in the case of a discrep-
ancy between a written judgment and an unambiguous oral
pronouncement, the oral pronouncement is the real sentence
and a defendant who seeks to impose that sentence is not
"challenging" the district court's sentence.

We are not persuaded by the government's request to in-
stead adopt the Fifth Circuit's contrary view in *United States
v. Higgins*, 739 F.3d 733 (5th Cir. 2014). The Fifth Circuit rea-
soned that an oral pronouncement and a written judgment are
"both considered the sentence," and that the common rule
about an oral pronouncement's precedence is merely a tool to
resolve ambiguities between the "two sentences." *Id.* at 739.
But that reasoning conflicts with the general rule that only a
district court's oral pronouncement is the sentence, and any
conflicting written judgment is a "nullity." *Medina-Mora*, 796
F.3d at 700 (collecting cases). Granted, if the oral pronounce-
ment is ambiguous, we may consider the entire record, in-
cluding the written judgment, to resolve the ambiguity and
better understand the oral pronouncement. *Id.* But the "law is
clear: The only sentence that is legally cognizable is the actual
oral pronouncement in the presence of the defendant." *United
States v. Bergmann*, 836 F.2d 1220, 1221 (9th Cir. 1988) (quota-
tions omitted). This principle is further reflected in the Fed-
eral Rules of Criminal Procedure, which specify that a defend-
ant must be present at sentencing. FED. R. CRIM. P. 43(a). Our
unpublished decision in *Tancil* properly tracks with this un-
derstanding, as does at least one other circuit that has adopted

*Tancil* in a published decision. *See United States v. Singletary*, 984 F.3d 341, 345 (4th Cir. 2021). *Higgins*, on the other hand, is an outlier; the government cites no other circuit that has adopted the Fifth Circuit's rule, nor have we found any.

We need look no further than *Tancil* to see the absurd and unjust results that can happen if a waiver is enforced against this type of claim. Because of the inartful drafting of the written judgment in that case, the Bureau of Prisons would have enforced a sentence five years longer than the district judge intended—without any process for the defendant to contest the written variant at the time of sentencing. At oral argument in this case, the government suggested that defendants like Tancil should instead use petitions for writs of mandamus to avoid their appeal waivers. But the government does not explain why its interpretation of the appeal waiver would not also apply to mandamus petitions, nor why such petitions would be appropriate even though mandamus generally cannot be used as a substitute for the regular appeal process. *See Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380–81 (2004).

Accordingly, we conclude that the panel in *Tancil* got it right, and we join the Fourth Circuit in holding that a defendant's waiver of his right to challenge his sentence does not bar him from seeking to have a district court's oral pronouncement of a sentence imposed when that oral pronouncement conflicts with the written judgment.

### 2. *We decline to exercise the concurrent sentence doctrine*

The government next asks us to rely on the concurrent sentence doctrine, under which we may decline to consider a challenge to the length of a sentence if the challenged sentence is shorter than another valid and concurrent sentence. *See*

*United States v. Brough*, 243 F.3d 1078, 1081 (7th Cir. 2001). The idea behind the doctrine is that review is unnecessary when the challenged sentence does not affect the total aggregate punishment. *Id.*; *United States v. Griffin*, 652 F.3d 793, 802 n.4 (7th Cir. 2011). The concurrent sentence doctrine applies primarily in habeas cases. *E.g., Ruiz v. United States*, 990 F.3d 1025, 1033 (7th Cir. 2021). But we have also applied it in some limited circumstances when a defendant challenges only one of multiple concurrent prison sentences on direct appeal. *E.g., Brough*, 243 F.3d at 1081; *Griffin*, 652 F.3d at 802 n.4.

The parties dispute whether the concurrent sentence doctrine also applies to concurrent terms of *supervision*, or in a case where the written judgment is inconsistent with a judge's oral pronouncement. But ultimately, we do not need to decide whether the concurrent sentence doctrine applies in this context because any application of the doctrine is discretionary. *Ruiz*, 990 F.3d at 1033. Harris's claim fails on the merits, and we think it prudent to decide his appeal on that simpler basis. *See Estremera v. United States*, 724 F.3d 773, 775 (7th Cir. 2013) ("There is no necessary priority among non-jurisdictional reasons for rejecting a suit or claim.").

### 3. *Harris's claim fails on the merits*

"We review a claim of an inconsistency between the oral and written judgments *de novo*, comparing the sentencing transcript with the written judgment to determine whether an error occurred as a matter of law." *United States v. Johnson*, 765 F.3d 702, 710 (7th Cir. 2014) (citing *United States v. Bonanno*, 146 F.3d 502, 511 (7th Cir. 1998)). An unambiguous oral pronouncement always trumps the written judgment. *Id.* at 711. But when an orally pronounced sentence is ambiguous, we can refer to the written judgment to resolve the ambiguity and

determine the intended sentence. *Medina-Mora*, 796 F.3d at 700; *Bonanno*, 146 F.3d at 511. If the written judgment clears up any ambiguity, we can affirm the sentence as clarified. *See Bonanno*, 146 F.3d at 511–12.

Harris's claim fails because the oral pronouncement does not contradict the written judgment. At best, the district court's oral statements were ambiguous, and the written judgment merely clarified that ambiguity.

During the sentencing hearing, the district judge initially said that Harris would "be placed on two years of supervision upon his release." The judge did not distinguish between the individual terms of supervision on each count, most likely because supervised release terms always run concurrently. *See* 18 U.S.C. § 3624(e). When the probation officer informed the judge that Count 1 had a statutory mandatory minimum of five years' supervised release, the judge said he would "amend the judgment that I just announced to five years." Our most rational reading of these statements is that the judge intended to amend the sentence as to both counts: The judge announced a single term for the concurrent sentences, and then announced he would amend that term. At best, the judge's statements are ambiguous because the court did not clarify whether it was amending the sentence for both counts. But even if ambiguous, the written judgment confirms our initial interpretation.

Harris argues that the district judge clearly meant to extend the supervision period on only Count 1 because (1) the judge said he "hate[s]" lengthy supervision periods; and (2) the judge reluctantly increased the length of supervision on Count 1 only because of the statutory minimum for that count. But we do not see why the judge's distaste for lengthy

supervision bolsters Harris's case. Knowing that the supervision for each sentence would be served concurrently, *see* 18 U.S.C. § 3624(e), the judge reasonably may have kept them the same for sake of consistency. The judge also encouraged Harris to seek termination of his supervision after one year if he complied with his conditions during the first year. In other words, the judge hoped to avoid a lengthy term of supervision by modifying the sentence shortly after Harris's release from prison. In that instance, it would not matter whether his two terms of supervision matched or whether one was longer than the other.

We see no need to remand this case for clarification. No discrepancy exists between the court's oral pronouncement and written judgment. And to the extent that the court's oral statements are ambiguous when read in isolation, the written judgment resolves any ambiguity. We affirm the intended sentence as described in the written judgment.

### III

For the reasons stated above, we AFFIRM the judgments in all three appeals.